**Julius Leroy MEGGETT, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–78–370.**

Court of Criminal Appeals of Oklahoma.

Sept. 5, 1979.

Leslie R. Earl, Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Charles Helm, Legal Intern, for appellee.

## OPINION

BRETT, Judge:

The appellant, Julius Leroy Meggett, hereinafter referred to as the defendant, was accused by the State of shooting his wife. He was convicted of Shooting With Intent to Kill—Laws 1977, ch. 42, § 1, now 21 O.S.Supp.1978, § 652—in the District Court, Tulsa County, in Case No. CRF–77–2340. Punishment was assessed at thirty

(30) years' imprisonment. From that judgment and sentence the defendant has perfected an appeal to this Court.

Before the jury was sworn at the defendant's trial, his attorney made an application to have the defendant committed to Eastern State Hospital for a mental examination. The application was made pursuant to 22 O.S.1971, § 1171. The defendant testified in chambers regarding the application. Two friends testified that in their opinions the defendant needed psychiatric help. The trial court denied the application, stating that based upon the testimony and his observation of the defendant he had no question in his mind concerning the defendant's sanity.

■ In his first assignment of error, the defendant asserts the trial judge erred by denying his application for commitment. We disagree.

Title 22 O.S.1971, § 1171, reads as follows:

"If any person is held in confinement because of criminal charges, or if he has criminal charges pending or likely to be filed against him, or if he has been taken into custody because of a criminal act or acts, and prior to the calling of an indictment or information for trial or preliminary hearing, a doubt arises as to his present sanity, either such individual or the district attorney may make application to the District Court for an order committing such individual to a state hospital within the Department of Mental Health for observation and examination for a period not to exceed sixty (60) days. Provided, however, where an adequate examination can be had in the county where the charge is pending, such examination shall be held in such county. Provided, however, the court may extend the sixty-day period where a need for such extension is shown. Any criminal proceedings against such individual shall be suspended pending the hearing of the application by the District Court."

The decision to commit a defendant rests within the sound discretion of the trial court; and the existence of a doubt concerning a defendant's sanity must arise from facts and circumstances of a substantial character. *Haynes v. State*, Okl.Cr., 473 P.2d 299 (1970); *Jones v. State*, Okl.Cr., 542 P.2d 1316 (1975).

■ In the instant case, the defendant did raise a doubt as to his sanity and did apply to the District Court for commitment to a state hospital for examination. The court conducted a hearing, at which the defendant and two other witnesses testified concerning his sanity. The trial judge was able to assess the defendant's ability to understand the proceedings against him and his ability to assist defense counsel from his answers to questions and his demeanor, and the court denied the application. From a review of the evidence, we believe the denial was not an abuse of the discretion given the trial judge, and absent a showing of such abuse reversal is not warranted.

■ The defendant next contends that the prosecutor's alleged definition of "reasonable doubt" in a comment to jurors during voir dire examination without subsequent instructions by the trial judge defining "reasonable doubt" was error. We again disagree.

We have examined the remarks of which the defendant complains and we do not find them to be injurious, as he contends they are. The defendant argues, citing *Gresham v. State*, Okl.Cr. 396 P.2d 374 (1964), that the prosecutor's remarks [1] constituted an

1. "In a criminal lawsuit, as many of you know by now, the State is charged with the burden, as stated by the case law, the burden of proof by competent evidence of the guilt of the accused beyond a reasonable doubt. And in arriving at what reasonable doubt is, it is appropriate, and the law so instructs. If you are chosen as jurors in this case, I anticipate His Honor, Judge Dalton, will instruct you that in arriving at that you can use your common sense, that rationality and reason that you acquire in your experience in arriving at what is reasonable. Is there reasonable doubt, and not beyond any doubt at all, not beyond a shadow of a doubt. Those are not the [tests] of whether the State has met its burden, but it's beyond a reasonable doubt."

\* \* \* \* \* \*

improper attempt to define "reasonable doubt"; but when they are taken in context it is clear that the prosecutor was trying to make certain the prospective juror understood the burden which is placed upon the State. We do not believe any error was committed.

■ The defendant's third assignment of error is that cross-examination by the prosecutor, concerning the Bible which the defendant was carrying during the trial,[2] was prejudicial. The weight of the evidence against the defendant was great, and for that reason the questioning does not merit reversal; but we nevertheless disapprove of the prosecutor's line of questioning—it is not relevant to the case and, while it may have been intended to impeach the defendant's credibility, it was an improper manner of doing so.

■ The fourth assignment of error relates to the jury instructions. Laws 1977, ch. 42, § 1, now 21 O.S.Supp., 1978, § 652, reads as follows:

"MR. GANN: Very well. Sir, then let's put it this way. If the Court were to instruct you that it is the law that if the State has proven its case beyond a reasonable doubt, but not beyond any doubt at all, are you telling His Honor, Judge Dalton, you cannot follow that law, if it were so given to you in the case? If he should say: 'Ladies and gentlemen of the jury, if you find that the State has met its burden in the case and proven guilt beyond a reasonable doubt,' then you should not convict him. But if the law that His Honor instructs you were to say: 'Ladies and gentlemen of the jury, you are not to apply the burden of guilt beyond any doubt in arriving at a verdict of guilt or innocence in this case,' could you follow that law? MR. COLLINS: If the evidence were applied that way."

2. "Q. How would you describe Eva Dourrough's friendship with you?
"A. Sisters and brothers.
"Q. Sisters and brother. Sisters and brothers as in religious sisters and brothers?
"A. More or less, religious.
"Q. You have something in your hand, sir, I would like to see that, if I could.
"A. Do I have to let you see this?
"Q. It's up to you. If you want to hide it it's fine with me.
"A. This is a Bible.
"Q. Can I see it? And you are a religious man?
"A. You know, I respect the law.

"Every person who intentionally and wrongfully shoots another with any kind of firearm, with intent to kill any person, is punishable by imprisonment in the penitentiary not exceeding life. Any person who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death, or in any manner attempts to kill another, or in resisting the execution of any legal process, is punishable by imprisonment in the penitentiary not exceeding twenty (20) years."

The trial court instructed the jury on shooting with intent to kill, but refused to instruct on the remainder of the Section. The defendant maintains that that refusal was error.

It is clear from the record that the ruling of the trial judge was based on his belief that Section 652 is intended to cover all assaults made with the intent to kill: that the first sentence is for assaults with a firearm and the remainder of the Section is

"Q. But you're not a religious man?
"A. I'm religious.
"MR. LATIMER: I object to that.
"THE COURT: Sustained.
"BY MR. GANN:
"Q. How long have you had this Bible?
"A. Oh, quite a while.
"Q. How long?
"A. I can't pinpoint how long, sir.
"Q. Years?
"A. No, not years.
"Q. Months?
"A. Months.
"Q. How many months? Did you get it when it was hot outside in the summer? Did you get it in the fall, or did you get it recently?
"A. It was brought to me in jail.
"Q. When? It was sometime after October 7th, wasn't it?
"A. Yeah.
"Q. Who brought it to you?
"A. The name is in there.
"Q. 'Allen,' and something is scratched out.
"A. Nelson.
"A. 'Love'—
"A. That's the man or male that brought me the Bible.
"Q. Do you read this thing frequently?
"A. I read it every night."

for other assaults with such intent. We affirm the trial court's ruling. Section 652 prohibits all assaults—whether by firearm or by some other dangerous weapon—made with the intent to kill. An assault—whether by firearm or by some other dangerous weapon—made *without* the intent to kill is proscribed by 21 O.S.1971, § 645. Clearly, only the first part of Section 652 is applicable since a firearm was used. This assignment of error is without merit.

Finally, the defendant complains of comments made by the prosecutor in closing argument. This assignment of error has some merit. Some of the remarks of the prosecutor[3] can in no way be considered fair comments on the evidence. Nor are they in answer to anything raised by the defendant. The remarks are totally improper and were it not for the overwhelming evidence of guilt, this case would have to be reversed because of them. Under the circumstances, we believe that the minds of the jurors were not swayed between guilty and not guilty verdicts by the prosecutor's misbehavior, but they may well have been swayed to return a more severe penalty than they would have given otherwise. For that reason and because of the improper cross-examination of the defendant, the sentence is *MODIFIED* from a term of thirty (30) years' imprisonment to a term of fifteen (15) years' imprisonment and is otherwise *AFFIRMED*.

CORNISH, P. J., and BUSSEY, J., concur.

---

3. ". . . A good citizen? Yeah. He was a good citizen. Charles [Manson] was a good citizen before the eyes of the law, before he committed his first crime; so was Patty Hearst, so was Al Capone, before they committed their first crime. And I suspect that somewhere in the vast metropolitan area of Chicago you could have found somebody to say, 'Yeah, I knew John Dillinger. He was good to me. He was a good employee of mine.' And I think perhaps even Charles [Manson] had a character witness or two at his trial. . . .

"You know, if you find this man not guilty there are two things you'll do. . . .

\* \* \* \* \* \*

". . . You will approve and say, 'Okay, Tulsa citizens, it is open season on spouses. Take your shot."