2008 OK CR 25

**Louis R. YOUNG, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2007–322.**

Court of Criminal Appeals of Oklahoma.

Aug. 12, 2008.

Steven Vincent, Tulsa, OK, attorney for defendant at trial.

Larry Stuart, District Attorney, Pawhuska, OK, attorney for the State at trial.

Sandra Mulhair Cinnamon, Okla. Indigent Defense System, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General, Keeley L. Harris, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

### OPINION

LEWIS, Judge.

¶ 1 Louis R. Young, Appellant, was tried by jury in the District Court of Osage County, Case Number CF–2005–266A, and convicted of murder in the first degree, in violation of 21 O.S.Supp.2004, § 701.7(A). The jury sentenced Appellant to life imprisonment without parole. The Honorable M. John Kane IV, District Judge, imposed judgment and sentence accordingly. Mr. Young appeals.

### FACTS

¶ 2 Jerry Doyle was addicted to cocaine. His wife knew of his prior problems with drugs, but believed he was clean at the time he disappeared. Doyle was trying to start a pet business in his hometown of Neosho, Missouri. He left home on June 27, 2005, telling his wife he was headed to Coffeyville, Kansas, to meet a kennel owner and look at some dogs. Doyle sent a text message to his wife two days later on June 29, telling her he would be home in two or three days.

¶ 3 Doyle was actually in Tulsa, buying and using cocaine. He had made these trips before, staying with fellow drug users or renting a room while bingeing on cocaine. Doyle's acquaintances in the Tulsa drug world included Sharon Daniels, a fellow drug user, and Appellant, a drug dealer from whom Doyle bought cocaine. Doyle would sometimes loan Appellant his silver Toyota Camry, and had purchased auto parts for a car Appellant was repairing. Their acquaintance took a tragic turn when Appellant began to suspect Doyle was an undercover informant or police officer. The State theorized that Appellant and an accomplice, Reggie Lester Phillips, hatched and executed a plan to kill Jerry Doyle.

¶ 4 Sharon Daniels testified that in those last days of June, 2005, she and Jerry Doyle passed a twenty-four hour period at her Tulsa residence, talking and using cocaine. Daniels went to bed at some point. She thought Doyle was leaving for Missouri, but he was still sitting at her table when the door bell woke her in the early morning hours. Rhea Goe, Appellant's girlfriend, came in and asked Jerry Doyle to come with her. Before leaving with Goe, Doyle gave Daniels two bags of crack cocaine to keep for him, and told her he would be back in fifteen or twenty minutes. Jerry Doyle never returned.

¶ 5 Rhea Goe, Appellant's girlfriend, testified that after midnight on June 30, 2005, Appellant called and told her to go to Sharon Daniels' apartment and pick up Doyle. Appellant told Goe that Doyle's car had broken down in west Tulsa. Around 2 a.m., Goe went to Sharon Daniels' apartment and asked Doyle to come with her, repeating Appellant's story that Doyle's car had broken down. She followed Appellant's instructions and drove with Doyle to a location on West 33rd Street, where metropolitan Tulsa crosses into Osage County. Doyle's silver Camry was parked on the side of the road with the hood up and the hazard lights flashing.

¶ 6 Goe testified that when Doyle approached the car to look under the hood, Reggie Phillips grabbed him from behind and put a knife to his throat. Appellant stood in front of Doyle and pointed a gun at him. Doyle emptied his pockets on Appellant's command. Goe then saw Phillips, Appellant and Doyle disappear into the wooded area just a few feet from the roadside. Goe could hear Jerry Doyle pleading for his life. Within seconds, she heard seven or eight gun shots. She then drove away from the scene and returned to the apartment she shared with Appellant.

¶ 7 Appellant and Phillips soon arrived at the apartment driving Doyle's Camry. Phillips left, while Appellant came inside. The following morning, Appellant, Rhea Goe, and another drug addict, Alice Nelson, began presenting fraudulent checks using the checkbook stolen from Jerry Doyle. They forged and passed two $500 checks drawn on Doyle's account, for which Appellant paid Nelson about $80 and some cocaine. Another drug addict, Ricky Evans, cashed a third $500 check drawn on Jerry Doyle's account. At some point, Appellant told Rhea Goe that Jerry Doyle was killed because he was a snitch.

¶ 8 Barbara Doyle became concerned when Jerry did not return home as expected. Bank records told her that three of his checks had been cashed in Tulsa. The signatures were forged. Barbara traveled to Tulsa and filed a police report. Jerry Doyle officially became a missing person on July 7, 2005. That same week, Appellant and Rhea Goe moved from 1415 N. Cheyenne to Silver Creek Apartments. Appellant paid the lease with money stolen from Jerry Doyle's account.

¶ 9 On September 6, 2005, workers mowing in west Tulsa discovered a human skeleton. Dental records identified the body as the remains of Jerry Doyle. Forensic pathologist Andrew Sibley recovered four bullets settled in clothing found with the bones, and found bullet defects to the bones of the left ribs and the pelvic area. Dr. Sibley concluded the death was a homicide by multiple gunshot wounds.

¶ 10 Tulsa police served a search warrant on Appellant's Silver Creek apartment early on the morning of September 23, 2005. Appellant and Rhea Goe were in the apartment when police arrived. Police arrested Appellant and Goe after they recovered a trafficking quantity of crack cocaine in a purse at the head of the bed. During interrogation at the Detective Division of the Tulsa Police Department, Rhea Goe implicated Appellant in Doyle's murder.

¶ 11 Appellant waived his *Miranda* rights and ultimately admitted that he and Reggie Phillips killed Jerry Doyle. Appellant accused Reggie Phillips of shooting Doyle while Appellant held the knife. He also told police the knife he used in the murder was located at the home of Mattie Johnson. He eventually pointed investigators to a drainage ditch near the Silver Creek Apartments where police recovered a pistol. Ballistics comparison matched two 9mm shell casings recovered near Jerry Doyle's remains to the pistol identified by Appellant.

¶ 12 Mattie Johnson testified she had seen Reggie Phillips carrying a knife into her house. She saw the same knife again some days later on her porch, when Appellant and Rhea Goe were there. She asked Appellant whose knife it was. Appellant picked the knife up and looked at it, wiped it off, and threw it back down. Mattie Johnson called Reggie Phillips to come and get the knife, but ultimately gave the knife to another man, Reggie Robinson. Robinson's sister, Diane, testified he brought the knife home and intended to sell it. She spoke with Detective

Chris Stout about the knife in October, 2005, and turned the knife over to police.

¶ 13 Appellant did not testify in his defense. He presented testimony from an aunt tending to show that he was "scared of guns" and did not regularly use firearms in his business as a crack dealer. The witness also testified that Rhea Goe continued to deliver cocaine to Sharon Daniels after Appellant's arrest, disputing Goe's testimony during the State's case denying she was a cocaine dealer. On cross-examination, the State showed the witness was unaware Appellant had been arrested for firearms possession on a prior occasion.

### ANALYSIS

¶ 14 In Proposition One, Appellant claims the District Court denied him compulsory process to obtain witnesses for his defense, in violation of Article II, § 20 of the Oklahoma Constitution. In *Noel v. State*, 1920 OK CR 55, 17 Okla.Crim. 308, 188 P. 688, this Court said a defendant's right to compulsory process "involves, as a matter of course, the time reasonably necessary to prepare for trial and to find and produce testimony in his defense ... Continuances ought always to be granted ... to enable the defendant to procure all legal and competent evidence necessary for the fair presentation of his defense, *if he has used due diligence to obtain the same.*" (emphasis added). *Id.* at 690.

¶ 15 Sharon Daniels and Rhea Goe gave testimony against Appellant in the State's case-in-chief and were subject to defense cross-examination. At defense counsel's request, the District Court ordered both witnesses to remain on call. The State furnished defense counsel with contact information for both witnesses. On the morning the witnesses were notified to reappear, defense counsel stated that "Ms. Goe indicated to one of my legal assistants she was going to be here today." Counsel further stated that Sharon Daniels had told someone on his staff she needed a ride to Court, and "I thought we had sent somebody over there to pick her up, but she's also not here, so I don't know if that's—I haven't been able to run down what the actual situation is on her, but

from the standpoint of defense strategy she would be called, but she was a relatively small cog compared to Ms. Goe." Neither of the witnesses returned to Court to give additional testimony for the defense. Defense counsel made an offer of proof detailing their proposed testimony. Appellant decided not to testify and the defense rested. Appellant now argues the District Court's failure to secure the witnesses' attendance denied him compulsory process.

¶ 16 This is not the typical compulsory process claim, where the defendant unsuccessfully prays for a continuance at trial after a material defense witness under subpoena fails to appear. *E.g., Yeatman v. State,* 1926 OK CR 133, 34 Okla.Crim. 20, 244 P. 828. In such cases, "[a]n application for continuance on account of the absence of a witness *must show diligence has been used to procure the witness or his testimony.* When this is not made to appear, it is not error to overrule such application." *Rucker v. State,* 1938 OK CR 51, 64 Okla.Crim. 259, 264, 79 P.2d 629, 632. (emphasis added). We think it equally true that where the Court releases a witness from daily trial attendance, subject to appear on call, defense counsel must use due diligence to obtain the witness' attendance at the time testimony is required, and seek assistance through the Court's coercive powers if the witness fails to appear.

¶ 17 Our cases indicate due diligence requires more than simply noting a subpoenaed witness is absent after counsel has notified the witness to appear. "... [I]f these witnesses had been duly subpoenaed, then it was the duty of the defendant to ask that attachments issue ... The law requires diligence in these matters ..." *Romine v. State,* 1913 OK CR 307, 10 Okla.Crim. 350, 352, 136 P. 775, 776; *Cornett v. State,* 1952 OK CR 141, 96 Okla.Crim. 125, 127, 250 P.2d 55, 58 (where counsel requested attachments for absent witnesses under subpoena, trial court's refusal was error); *Snow v. State,* 1969 OK CR 124, ¶ 3, 453 P.2d 274, 276 (failure to request attachment of absent wit-

nesses showed lack of diligence and failure to exhaust legal remedies).

■ ¶ 18 We find here that the record "does not disclose such diligence on the part of the defendant to procure the attendance of these witnesses as the law requires, or such that made it the duty of the court to grant the continuance." *Romine*, 10 Okla.Crim. at 352, 136 P. at 776; *Ross v. State*, 1926 OK CR 252, 34 Okla.Crim. 363, 365, 246 P. 645, 646 (where subpoenaed witness failed to appear, but counsel did not request attachment, continuance was properly denied). The record shows, at most, counsel's representatives verbally requested that these witnesses appear and give further testimony. Counsel did not seek a continuance, ask for bench warrants to arrest the witnesses, or request that the witnesses be transported to Court by the Sheriff. He simply noted their absence, dictated their proposed testimony into the record, and proceeded with his case. A few hours or a day's continuance, and bench warrants commanding the arrest of these witnesses, probably would have ensured their attendance at trial. Appellant has not shown due diligence, nor has he shown that any proper request for compulsory process was denied.[1] Proposition One requires no relief.

■ ¶ 19 Appellant argues in Proposition Two that the District Court improperly admitted his involuntary statements in violation of the privilege against self-incrimination. Okla. Const. art. II, § 21; U.S. Const. amends. V, XIV. A confession is voluntary, and thus admissible in evidence, only when "it is the product of an essentially free and unconstrained choice by its maker." *Young v. State*, 1983 OK CR 126, ¶ 10, 670 P.2d 591, 594, *citing inter alia, Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When confronted with an objection to such evidence, the District Court must look to the totality of the surrounding circumstances, including the characteristics of the accused and the details of the interrogation, to determine if the subject's will was overborne. When the admissi-

bility of a defendant's incriminating statement is challenged at trial, the State must establish voluntariness by a preponderance of the evidence. *Young*, at ¶¶ 10–11, 670 P.2d at 594. The District Court heard evidence on the voluntariness of Appellant's statements in an *in camera* hearing pursuant to *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and ruled the statements were admissible. On appeal, we consider whether the District Court's ruling "is supported by competent evidence of the voluntary nature of the statement." *Davis v. State*, 2004 OK CR 36, ¶ 34, 103 P.3d 70, 80.

■ ¶ 20 Police arrested Appellant shortly after 6 a.m. on September 23, 2005, and transported him to the Detective Division of the Tulsa Police Department. Interrogators gave Miranda[2] warnings to Appellant. Appellant could read and write, and told detectives he had completed the tenth grade. He denied being under the influence of alcohol or drugs. The detectives observed that Appellant seemed to understand their statements and respond appropriately. Around 8:25 a.m., Appellant waived the protections of *Miranda* in writing and agreed to answer questions about this crime.

¶ 21 The interrogating officer denied threatening or promising Appellant anything before or during questioning. This first interview lasted until early evening, approximately 7 p.m. Appellant was given something to drink and allowed to use the restroom during this period. He was offered food but declined. At the conclusion of the first interview, two officers took custody of Appellant and prepared to take him to jail. During the short trip to jail, one officer told Appellant he needed to help himself, because Reggie Phillips had already accused Appellant of shooting Jerry Doyle. Appellant told the transporting officers to turn around, because he wanted to tell his side of the story to investigators. Back at the Detective Division, Appellant then gave a further oral statement and an incriminating statement in his own handwriting, finished around 8:39 p.m. The interrogators again told Appellant he could

---

1. In Proposition Three, we address whether counsel's lack of diligence in this matter violated Appellant's right to effective counsel.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

corroborate his statements by taking them to the gun. Appellant told them he could locate the gun if he were released, an offer the detectives declined.

¶ 22 After this interview, officers again prepared to transport Appellant to jail. During this second trip, the transporting officer again urged Appellant to cooperate, telling him that if he helped police recover the murder weapon it would help his credibility and corroborate his story. This time, Appellant agreed. Investigators met the transporting officers outside the Detective Division. After reminding Appellant of his *Miranda* warning, investigators asked Appellant if he would take them to the weapon. Appellant and the investigators then drove to the area near Silver Creek Apartments and recovered the weapon. Appellant also explained his knowledge of the murder weapon's location near his apartment by telling police he had watched Reggie Phillips hide the pistol.

¶ 23 Appellant's interrogation continued until approximately 10 p.m. that evening. Detectives reminded Appellant verbally of his *Miranda* rights more than once during the day. Each time, Appellant indicated he wanted to talk. The interrogating and transporting officers testified that Appellant was not physically abused, denied food or drink (other than when he requested a beer), threatened, or promised anything in exchange for his statements.

¶ 24 Appellant initially denied any involvement, but ultimately told police how he and Reggie Phillips marched Doyle into the woods and Phillips shot Doyle several times. We find from the totality of the circumstances, there is competent evidence supporting the District Court's decision to admit these statements.[3] Aggressive police interrogation clearly played a role in Appellant's decision to cooperate with police, but he was not coerced into giving information against his will. Proposition Two is denied.

¶ 25 In Proposition Three, and an accompanying *Application for Evidentiary Hear-*

*ing on Sixth Amendment Claims,* Appellant argues counsel's ineffectiveness violated his constitutional rights. Okla. Const. art. II, § 20; U.S. Const. amend. VI. Counsel's allegedly unprofessional omissions include his failure to: (1) exercise due diligence in obtaining the appearance of Appellant's witnesses at trial; (2) adequately investigate, prepare, and counsel Appellant before the *Jackson v. Denno* hearing, resulting in a "devastating" failure to present Appellant's testimony at that hearing; and (3) object to prosecutorial misconduct in closing argument.

¶ 26 In this claim, Appellant must demonstrate that trial counsel's performance was deficient under prevailing professional norms, and that he was prejudiced by the deficient performance. *Black v. State,* 2001 OK CR 5, ¶ 65, 21 P.3d 1047, 1070, *citing Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland's* deficient performance prong requires a showing that counsel made "errors so serious that counsel was not functioning as the 'counsel' guaranteed … by the Sixth Amendment." Id. Deficient performance is shown only where counsel's representation was unreasonable under prevailing professional norms and the challenged action could not be considered sound trial strategy. Id. at 688–89, 104 S.Ct. at 2065. The fundamental inquiry is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. *Bryson v. State,* 1994 OK CR 32, ¶ 73, 876 P.2d 240, 264. To demonstrate prejudice, Appellant must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.

¶ 27 We first examine in greater detail the allegation that counsel's representation was deficient in failing to secure wit-

---

**3.** In his *Application for Evidentiary Hearing on Sixth Amendment Claims,* Appellant testifies by affidavit to a considerably divergent account of his interrogations. This affidavit is not part of the record on appeal. We address Appellant's allegations and his related claim of ineffective assistance of counsel in our analysis of Proposition Three.

nesses for the defense. After Rhea Goe and Sharon Daniels testified under subpoena for the State, defense counsel consented to the Court releasing them from daily attendance, subject to appear on call. Both witnesses lived in Tulsa. The State had contact information for Goe and Daniels and was at all times willing to contact them at counsel's request. After Court recessed on Thursday evening, the prosecution advised defense counsel it had only one witness left to present, and asked counsel if he intended to call any defense witnesses the following day. Counsel gave no indication to the prosecutor that he required Goe or Daniels to attend Court on Friday. It was not until sometime Friday afternoon that defense counsel first asked the State to contact the witnesses and notify them to appear in Court.

¶ 28 When the State contacted Rhea Goe on Friday afternoon, Goe said she could attend but had no transportation. The State told Goe to contact defense counsel's office assistant, who had apparently been enlisted by counsel to bring the witness to Pawhuska. After several attempts to contact counsel's assistant, Goe finally reached the assistant's son, who told her he had a prior commitment and could not give her a ride. The State was unable to contact Sharon Daniels on Friday. In light of these difficulties contacting the witnesses and arranging their appearance on short notice, the prosecutor remarked that defense counsel "has known that these witnesses have a difficult time making it from Tulsa to Osage County. Some of these witnesses have not been able to get a ride and we have been required to ask the Sheriff's Office to transport those witnesses up here." Defense counsel told the Court that by Monday "I will be able to arrange transportation for these ladies ... and get them here, for certain, Monday morning." Defense counsel made his opening statement and called one witness Friday afternoon. The Court then recessed the case until Monday.

¶ 29 On Monday morning, defense counsel arrived late for Court (as he had on other occasions during trial) and plainly had no idea of the status of his witnesses. Counsel told the Court that "Ms. Goe indicated to one of my legal assistants she was going to be here today. I was too anxious to get on the elevator to come up here, rather than peek in the Victim/Witness Center and I was wondering if she was present there. I didn't see her up here." Counsel then indicated that "[f]rom the standpoint of again trying to avoid any further delay, if those witnesses are not present later on, we can make a short record about it, but then, I believe, Mr. Young is going to exercise his right to testify."

¶ 30 Counsel also told the Court his staff had been in contact over the weekend with witness Sharon Daniels, and "I thought we had sent somebody over there to pick her up, but she's also not here, so I don't know if that's—I haven't been able to run down what the actual situation is on her, but from the standpoint of defense strategy she would be called, but she was a relatively small cog compared to Ms. Goe." Counsel then made an offer of proof about the testimony he had hoped to elicit from Ms. Goe, concluding that "her failure to be here is damage to the defense." The Court observed that the State had not orchestrated or encouraged the witnesses' failure to appear. Counsel agreed, and added that "if they are not here and there is some blame to go around on either side, we are wanting them here and the State has not thrown in any roadblocks that I'm aware of." The Court answered, "All right, we will just let the record speak for itself in that regard." Appellant did not testify, and the defense rested.

¶ 31 Applying *Strickland*, we find counsel's fumbling approach to arranging the attendance of witnesses was destined to produce substandard results. Defense counsel took an ill-considered risk by releasing these out-of-county witnesses in the first place. Both witnesses lived at least an hour's drive away in Tulsa. Both were fearful of giving testimony. Some of the witnesses, possibly both Goe and Daniels, had required State or borrowed transportation to attend prior court appearances. These facts establish that defense counsel disregarded a strong possibility that the witnesses would fail to appear on call. The record reveals little or no real effort over the weekend to ensure the witnesses would appear on Monday. In the

end, counsel's feckless courtesy in releasing the witnesses merged with his personal neglect of their arrangements to create a potentially disastrous situation.

¶ 32 The failure to diligently schedule and arrange for the appearance of witnesses is inconsistent with professional norms of representation for attorneys in criminal cases. Such errors can be so serious that counsel defaults the constitutional function. Counsel who undertakes representation requiring the presentation of testimony must vigilantly arrange for the appearance of witnesses at the time their testimony is required; and exhaust coercive remedies to compel their attendance when properly summoned witnesses fail to appear. *Romine,* 10 Okla.Crim. at 352, 136 P. at 776 ("[I]f these witnesses had been duly subpoenaed, then it was the duty of the defendant to ask that attachments issue ... The law requires diligence in these matters ..."); *Lacy v. State,* 1925 OK CR 253, 30 Okla. Crim. 273, 276, 236 P. 53, 54 (defense could have obtained testimony from absent subpoenaed witness "if they had seen fit to invoke the processes of the court"); *Compton v. State,* 1930 OK CR 315, 48 Okla.Crim. 120, 123–124, 289 P. 794, 795–796 (refusal of continuance was reversible error where counsel filed verified motion showing subpoenaed witness was material and sought issuance of attachment for witness who failed to appear at trial).

¶ 33 Our laws afford a criminal defendant powerful means for obtaining the testimony of witnesses, but these rights to compulsory process are useless when counsel fails to assert them diligently. *See* Okla. Const. art II, § 20; 22 O.S.2001, §§ 703–723. Rule 1.1 of the Oklahoma Rules of Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A provides that competent representation "requires the legal knowledge, skill, *thoroughness, and preparation reasonably necessary for the representation.*" (emphasis added). Rule 1.3 requires that "a lawyer shall act with reasonable diligence and promptness in representing a client." Counsel here was repeatedly late for court. When his witnesses failed to appear, he did not seek a continuance, or bench warrants, or even ask that a Deputy

Sheriff be dispatched to transport the witnesses to Court. Counsel was neither thorough nor reasonably prepared to obtain witnesses for his client's defense, and in this respect his performance was deficient under *Strickland.*

¶ 34 We are equally convinced, however, that counsel's deficient performance resulted in no prejudice to Appellant. Counsel told the Court that Sharon Daniels' proposed testimony was a small "cog" compared to the more important proposed testimony of Appellant's girlfriend, Rhea Goe. Counsel detailed how he hoped to further impeach Ms. Goe with her inconsistent statements, and further examine the "value" of prosecutorial forbearance given in exchange for her testimony. On appeal, counsel tacitly concedes this testimony could not have reasonably affected the jury's finding of guilt, which was supported by other overwhelming evidence. Appellant argues only that with further testimony from Ms. Goe, "the jury could have believed [his] statements instead of Rhea Goe's and only imposed a sentence of Life, rather than Life Without Parole."

¶ 35 We disagree. The subjects of proposed defense testimony by Rhea Goe were fully covered in direct and cross-examination during the State's case. The speculative claim that the jury would have chosen any sentence other than Life Without Parole for this ruthless slaying falls short of any reasonable probability that the outcome of the trial would have been different. Trial counsel's deficient performance in failing to obtain witnesses for the defense did not result in a violation of Appellant's right to counsel.

¶ 36 We reach the same conclusion regarding Appellant's remaining arguments challenging the effectiveness of counsel. Because competent evidence supported the District Court's ruling on the voluntariness of Appellant's statements, Appellant can show no reasonable probability of a different outcome due to counsel's alleged failure to advise him or offer him as a witness at the *Jackson v. Denno* hearing. Appellant's presumptive testimony, contradicting his interrogators and accusing them of coercing his confession by promises and threats, would not have overcome the objective evidence

that Appellant chose to cooperate with investigators in the hope of improving his legal situation.[4] We conclude in Proposition Four that the prosecutor's challenged remarks did not rise to the level of plain error. Appellant was therefore not prejudiced by counsel's failure to object. *Hancock v. State*, 2007 OK CR 9, ¶ 109, 155 P.3d 796, 822. Proposition Three requires no relief.

¶ 37 In Proposition Four, Appellant first claims that the prosecutor improperly "went to great lengths to convince the jury that the only things he had to prove beyond a reasonable doubt were the four elements of malice aforethought murder." Of course, this was precisely what the law required the prosecutor to prove. The comments drew no objection at trial, and we review only for plain error. *Bland v. State*, 2000 OK CR 11, ¶ 89, 4 P.3d 702, 726. We reverse only where the prosecutor's grossly improper and unwarranted arguments affect a defendant's rights. *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556. Appellant now objects that the prosecutor's statements to the jury improperly contrasted the relative unimportance of inconsistent statements about the color of the cars involved in the offenses with the actual elements of murder set forth in the instructions. Appellate counsel interprets these statements as the prosecutor's attempt to dilute jury instructions requiring the State to corroborate the testimony of accomplices. These comments did not confuse or mislead the jury concerning its duties, nor did the comments result in Appellant's conviction upon uncorroborated accomplice testimony. *Bland*, at ¶ 90, 4 P.3d at 726; 22 O.S.2001, § 742. There is no plain error.

¶ 38 Finally, Appellant seeks relief from the prosecutor's comment "and you can sit here, and you can look at this man right here, and it's nice to dress up in a white shirt and a tie, an [sic] put a Bible, maybe he needs to turn that thing and read it." We review for plain error due to the lack of a contemporaneous objection at trial. *Bland, supra.* In *Short v. State*, 1999 OK CR 15, ¶ 78, 980 P.2d 1081, 1105, this Court held that a prosecutor's reference in argument to the defendant's apparent lack of remorse was "properly based upon Appellant's demeanor in the courtroom." However, in a footnote to the opinion in *Mehdipour v. State*, 1998 OK CR 23, ¶ 12, 956 P.2d 911, 916, the Court stated that a prosecutor may comment on the defendant's courtroom demeanor only when the defendant testifies. *Id.* at fn. 11, 956 P.2d at 916, *citing Mitchell v. State*, 1994 OK CR 70, ¶ 46, 884 P.2d 1186, 1203.

¶ 39 In *Meggett v. State*, 1979 OK CR 89, 599 P.2d 1110, *overruled on other grounds, Goree v. State*, 2007 OK CR 21, 163 P.3d 583, the Court disapproved of the prosecutor's questions of the defendant on cross-examination concerning the Bible he carried at trial and how much he had been reading it. We said in *Meggett* that the questioning was "not relevant to the case and, while it may have been intended to impeach the defendant's credibility, it was an improper manner of doing so." *Id.* at ¶ 8, 599 P.2d at 1113. Under *Mehdipour, Mitchell* and *Meggett*, the prosecutor's remark in closing argument that this non-testifying defendant should read the Bible he carried with him in court was error.

¶ 40 Erroneous remarks on a defendant's courtroom behavior do not always warrant modification or reversal. *Mehdipour*, at ¶ 12, 956 P.2d at 916; *Meggett*, at ¶ 8, 599 P.2d at 1113. In *Meggett*, the Court noted that the "weight of the evidence against the defendant was great, and for that reason the questioning does not merit reversal." *Id.* In *Webb v. State*, 1974 OK CR 58, 520 P.2d 825, the prosecutor remarked in closing argument that the record should reflect the defendant was "laughing and smiling at this point." On appeal, this Court found that "the defendant's demeanor was open to the jury's observation even without the comment. The fact that the prosecutor

---

4. We have reviewed Appellant's *Application for Evidentiary Hearing on Sixth Amendment Claims* to determine whether it contains "clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i), *Rules of the Court of Criminal Appeals*, 22 O.S.Supp.2008, Ch. 18, App. We find the submitted materials insufficient to warrant remand for an evidentiary hearing and deny the *Application for Evidentiary Hearing on Sixth Amendment Claims*.

may have helped call attention to it by comment is of secondary importance at most." *Id.* at ¶ 11, 520 P.2d at 830–831. Here, the prosecutor's brief, secondary reference to what jurors could already see did not cause plain error. Proposition Four is denied.

¶ 41 Proposition Five seeks reversal or modification based on the cumulative effect of errors at trial. We found trial counsel rendered deficient performance under *Strickland* by failing to diligently secure the attendance of defense witnesses, but concluded that Appellant suffered no prejudice. The prosecutor's erroneous comment suggesting Appellant should read the Bible he had kept with him during trial did not constitute plain error. Therefore we find no cumulative effect of errors to warrant reversal or modification of the judgment and sentence.

### DECISION

¶ 42 The Judgment and Sentence of the District Court of Osage County is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2007), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LUMPKIN, P.J., C. JOHNSON, V.P.J., CHAPEL, and A. JOHNSON, JJ., concur.