### STATE OF CONNECTICUT *v.* TOMAS D.*
### (SC 18415)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.**

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

** The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 12—officially released June 1, 2010

*Matthew A. Weiner*, with whom was *Charles D. Ray*, for the appellant (defendant).

*Timothy F. Costello*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Eva Lenczewski*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether the state violated the defendant's rights to compulsory process under both the sixth amendment to the United States constitution,[1] and article first, § 8, of the Connecticut constitution,[2] when the prosecutor failed

---

[1] The sixth amendment to the United States constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense." "The sixth amendment rights to confrontation and to compulsory process are made applicable to the states through the due process clause of the fourteenth amendment." *State* v. *Gilberto L.*, 292 Conn. 226, 229 n.2, 972 A.2d 205 (2009).

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf . . . . No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

to notify him that it had released from subpoena the lead police investigator, who then became temporarily unavailable to testify at the trial. The defendant, Tomas D., appeals[3] from the judgment of the trial court, rendered after a jury trial, convicting him of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2),[4] unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a),[5] and risk of injury to a child in violation of General Statutes (Rev. to 2005) § 53-21 (a) (2).[6] On appeal, the defendant, in addition to his subpoena claims, contends that: (1) the evidence at trial was insufficient to establish his guilt beyond a reasonable doubt; (2) the trial court abused its discretion by denying his motion for a new trial; and (3) prosecutorial impropriety deprived him of a fair trial. We disagree with the defendant's various claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. On Monday, May 1, 2006, the then twelve year old victim was living in Waterbury with her grandfather, T, and

---

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[5] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[6] General Statutes (Rev. to 2005) § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . a class B felony for a violation of subdivision (2) of this subsection."

her grandmother, E, who are the parents of the defendant, who is the victim's uncle. Shortly before 7 a.m. on that date, the defendant telephoned their home and asked the victim whether she was going to school that day; she informed him that she planned to attend. A few minutes later, the defendant telephoned again and told the victim that he would drive her to school; this was unusual because he had never driven her to school before, and she ordinarily took the school bus. Shortly thereafter, the defendant arrived and spoke with T, leading T to believe that the defendant would drive the victim to school so that T could bring his other younger grandchildren to their schools.

The defendant then drove the victim in his Jeep past her school bus stop, where she waved to O, one of her friends who was waiting there. While they drove, the defendant commented to the victim: "[He] had to make sure [the victim] get[s] to school, because [she] could get hurt outside if [she doesn't] get to school, if [she's] outside, because someone could rape [her] or something and—or kill [her]." Rather than drive the victim directly to school, the defendant drove to his apartment first and asked her to come inside because he needed to change out of his work clothing.[7] While the victim ate cereal in the defendant's kitchen, the defendant went upstairs to change, and then came down clad only in his boxer shorts. He then led her by the arm upstairs to his bedroom. Once they arrived in his bedroom, the defendant said, "for someone else to do it, that he'd rather do this himself," started to play a pornographic DVD that he took from a green plastic storage bin in the bedroom and directed the victim to go to the bed. The defendant then pushed the victim onto the bed, and pulled off her pants and underwear, groped her

---

[7] E, T and J, the defendant's fiancée, testified that the defendant worked the third shift for an electric cable company and regularly came home at approximately 6:40 a.m.

breasts and licked her vagina. When the victim told the defendant to stop, he said, "[d]on't make me use force," pulled her legs apart, and engaged in vaginal intercourse with her.

Several hours later, at approximately 2:30 p.m., after the victim already had tried unsuccessfully to leave the defendant's house on her own,[8] the defendant and the victim took his other Jeep to pick up M, the daughter of the defendant's fiancée. While in the car, the defendant asked the victim not to tell E what had occurred "because [E] would kill him," and told her to tell E that the defendant had picked her up from school because she was scared. After dropping M off at the defendant's home, they then drove toward the victim's house, where they came upon E and T walking with S, the defendant's sister, and several of their other grandchildren, including C, the defendant's daughter. The defendant pulled the Jeep over and told E that the victim had called him and asked to be picked up from school because she was scared.[9] After E gave the victim a key, C joined the victim and the defendant in the car for the rest of the trip to the victim's home; the rest of the family declined the defendant's offer of a ride, as they were already close to home.

The victim, T and E all testified that, in the days following May 1, the victim showered with unusual fre-

[8] In the time subsequent to the assault, the victim first ran to the downstairs bathroom where she cleaned "white stuff" from her body. The defendant then knocked on the door, asked the victim to "come out quick" and apologized to her, saying "he didn't mean to do that . . . it was an error." After she heard the defendant go upstairs to shower, the victim then tried to leave his home through the kitchen door, but he stopped her and told her to get inside. She then went upstairs to the bedroom of C, the defendant's daughter, where she stayed until approximately 2:30 p.m., when the defendant came to take her home.

[9] The victim testified that, because she did not own a cellular telephone, the defendant had told her to say that she called him on a school telephone.

quency,[10] acted withdrawn and locked herself in her bedroom when the defendant visited their home. When O subsequently asked the victim why she had not been in school that day, she told O about the assault; she did not, however, report it to an adult until Friday, May 5, when she told E. E then brought the victim to Saint Mary's Hospital.[11]

Following a police investigation, the state charged the defendant with sexual assault in the first degree in violation of § 53a-70 (a) (2), unlawful restraint in the first degree in violation of § 53a-95 (a), and risk of injury to a child in violation of § 53-21 (a) (2). Thereafter, the case was tried to a jury. After the trial court denied the defendant's oral motion for a judgment of acquittal on the basis of testimonial and documentary evidence that the victim had been marked present in school at the time of the assault,[12] the jury returned a verdict of guilty

[10] After the victim arrived home on May 1, she showered since she "felt dirty" because of what had happened; she threw away her clothes from that day several days later. T testified that he noticed that the victim did not "look well" in the car on that day, and also that it was unusual for her to shower immediately after coming home from school.

[11] Otilia Capellan, an emergency room physician at Saint Mary's Hospital in Waterbury, testified that she had examined and interviewed the victim on Friday, May 5, 2006. The victim, who was cooperative, but quiet and withdrawn, informed Capellan that she had been held down while the defendant had oral and vaginal intercourse with her, with only partial penetration. Capellan testified that she did not observe any visible injury, and that the delay in reporting likely had adversely affected the investigators' opportunity to see any physical signs of penetration or recover evidence using the rape kit, although the recovery of such evidence is not necessarily impossible after four days. Capellan also testified, however, that 75 percent of sexual assault cases lack physical evidence.

Deborah Messina, a forensic science examiner at the state forensic laboratory, testified that she tested the rape kit samples taken from the victim. Her analysis indicated that, likely because of the four day delay in reporting and testing, as well as the victim's repeated bathing, there was no physical evidence found that would link the defendant to the assault on the victim.

[12] The defendant's theory of the case was that the victim had framed him in retaliation for his disciplining her for poor school attendance, and that he could not have committed the crimes charged because the victim was at school at the time of the crimes on May 1, 2006. The state, however,

on all counts. The defendant then filed posttrial motions for a judgment of acquittal and for a new trial, claiming, inter alia, that the verdict was contrary to the evidence and that the state improperly had failed to inform the defense that it had released Scott Stevenson, a sergeant of the Waterbury police department and the lead investigator in this case, from his subpoena, causing him to leave for his scheduled vacation and become unavailable to testify at the trial, thus depriving the trier of fact of Stevenson's potentially material and exculpatory testimony.[13] The trial court denied both motions, rendered a judgment of conviction in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of thirty-five years imprisonment, execution suspended after nineteen years, and thirty years probation. This appeal followed. See footnote 3 of this opinion.

On appeal, the defendant claims that: (1) the evidence was insufficient to establish his guilt beyond a reasonable doubt; (2) the trial court improperly denied his motion for a new trial; (3) the state's failure to notify him that it had released Stevenson from subpoena violated his federal and state constitutional rights to compulsory process; and (4) prosecutorial impropriety deprived him of a fair trial.

introduced testimony from O and several of the victim's teachers, discussed further in part I of this opinion, indicating that these records were erroneous, and that she was in fact absent from school for that entire day.

[13] The defendant also claimed that the state improperly had failed to: (1) introduce the defendant's oral and written statements made during the course of the police investigation, thus forcing him either to testify or keep the jury from receiving those potentially material statements; and (2) develop material evidence—namely, S's cellular telephone records—necessary to prove that the victim and S were not committing perjury when they testified that the victim had not used S's cellular telephone to call the defendant to pick her up from school in the afternoon on the date of the assault. Along with rejecting these claims, the trial court also denied the defendant's motion for posttrial discovery of S's cellular telephone records. These claims are not at issue in this appeal.

I

## FACT BASED CLAIMS

We begin with the defendant's fact based claims that: (1) the evidence was not sufficient to establish his guilt beyond a reasonable doubt; and (2) the trial court abused its discretion by denying his motion for a new trial because the jury's verdict was contrary to the weight of the evidence.

### A

### Sufficiency of the Evidence

We begin with the defendant's claim that the evidence was insufficient to convict him of the crimes charged.[14] Specifically, the defendant argues that there was evidence, "not refuted by the state, that it was physically impossible for [him] to have committed the charged crimes because [the victim] was in school—not in [his] apartment—on the day and time that she claimed she was assaulted." The defendant also emphasizes the lack of physical evidence to support the victim's allegations, and that the only evidence of his guilt is "the inconsistent and contradictory testimony of the [victim]; testimony on the basis of which no reasonable person could have concluded that [he] was guilty beyond a reasonable doubt." In response, the state argues that the defendant's claim is a "misguided invitation to this court to second-guess the credibility determinations of the jury," and further contends that the verdict is supported by direct evidence, namely, the victim's testimony. We agree with the state and conclude that the evidence was sufficient to sustain the jury's verdict under the well

---

[14] We note that the defendant's sufficiency claim was properly preserved by his oral and subsequent written motions for a judgment of acquittal. See, e.g., *State* v. *Calabrese*, 279 Conn. 393, 401, 902 A.2d 1044 (2006). We review this claim prior to the defendant's other claims, because if he "prevails on the sufficiency claim, he is entitled to a directed judgment of acquittal rather than to a new trial." Id.

established standard by which we review sufficiency of the evidence claims. See, e.g., *State* v. *Na'im B.*, 288 Conn. 290, 295–97, 952 A.2d 755 (2008) (evidence construed in light most favorable to sustaining verdict in determining whether it is sufficient to prove guilt beyond reasonable doubt).

The defendant does not claim that the evidence, if properly credited by the jury, leaves unsatisfied any of the elements of the offenses charged under § 53a-70 (a) (2), § 53a-95 (a) or § 53-21 (a) (2). Rather, he contends that he could not have committed the crimes because attendance records from the victim's middle school indicate that she was there, rather than with him, on the day and at the time of the assault. The jury, however, reasonably could have found that those attendance records were the product of a data entry error committed by one of the victim's homeroom teachers, who had not recorded the victim as being absent when she took attendance using the "Letter Grade" computer program during homeroom, which lasted from 7:50 until 8 a.m.[15] O, who had seen the victim drive by the bus stop with the defendant, and was in all of her classes except for homeroom, testified that the victim was absent from all of her classes that day, and was not present when they customarily met up after homeroom to travel together to their first instructional period. June Kozloski, the victim's art teacher, testified that, in her individual records, she had recorded the victim as absent

---

[15] Nicole Negron and Nyree Toucet, the victim's homeroom teachers, testified that the homeroom attendance recorded using Letter Grade was the only official record of attendance kept by the school, although some teachers took attendance individually for their own records. Using Letter Grade, the homeroom teachers, without the benefit of a seating chart, would look out at the twenty-eight students seated in the classroom and then mark only the absent students; students present in the classroom did not have a mark recorded next to their name. We note, however, Negron's testimony that she paid special attention to the victim's attendance record because the victim had a history of excessive absences.

from her class, which was scheduled from approximately 12:30 until 1:20 p.m.[16] Kozloski also testified that, in her experience, the attendance indicated by Letter Grade frequently was erroneous. Heidi Doolan, the victim's music teacher, testified similarly. Finally, Rebecca Wisnie, a Waterbury police detective, testified that she had learned during her investigation that the victim had not taken an English test that was administered that day, either.

With respect to the defendant's claims that the victim's trial testimony was flawed by her unreliable memory,[17] and also was inconsistent with portions of her voluntary statement to the police, none of the claimed inconsistencies[18] negates the essential elements of the offenses charged, and is not a ground for reversal because "[q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *Mullins*, 288 Conn. 345, 365, 952 A.2d 784 (2008); see also, e.g., *State* v. *Linarte*, 107 Conn. App. 93, 117–18, 944 A.2d

---

[16] Kozloski also testified, however, that the victim previously had cut her class in the beginning of the marking period when she had not been aware that she was supposed to be in Kozloski's class.

[17] The defendant points, for example, to the victim's testimony that she did not have Toucet, who testified at trial, as a teacher, or even know who she was. See also footnote 15 of this opinion.

[18] For example, the defendant notes that: (1) at trial, the victim testified that she had stayed in the bathroom while the defendant was upstairs showering; in her statement, she stated that she had remained in the kitchen; (2) at trial, the victim testified that she had waved to O while passing the bus stop; in her statement, she stated that she had not paid attention to her surroundings while en route to the defendant's apartment; and (3) at trial, the victim testified that the defendant had touched her breasts under her shirt; in her statement, she stated that he had done so over her clothing.

369 ("[t]hough labeled as a challenge to the sufficiency of the evidence, this claim rests on an assessment of the witnesses' credibility"), cert. denied, 289 Conn. 901, 957 A.2d 873 (2008). Thus, we conclude that the jury's verdict was supported by sufficient evidence to prove the defendant's guilt of the offenses charged beyond a reasonable doubt.

## B

### Denial of the Defendant's Motion for a New Trial

The defendant next claims that the trial court abused its discretion by denying his motion for a new trial because there was a " 'serious danger' " that he was wrongfully convicted. Noting that appellate review of the trial court's action on this motion is more searching than that of a sufficiency of the evidence claim, the defendant again relies on the Letter Grade attendance records and inconsistencies in the victim's testimony, and contends that the jury's verdict was against the weight of the evidence presented at trial. In response, the state argues that the trial court did not abuse its discretion by denying the defendant's motion for a new trial because the school attendance records were not incontrovertible evidence that rendered the jury's findings physically impossible. We agree with the state and conclude that the trial court did not abuse its discretion by denying the defendant's motion for a new trial.

When a defendant claims that "he should be granted a new trial because of the serious danger that he was wrongly convicted . . . [t]he trial court should not set [aside] a verdict . . . where there [is] some evidence upon which the jury [reasonably could have] based its verdict, but [the court should set aside the verdict] where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that [the jurors] or some

of them were influenced by prejudice, corruption or partiality. . . . Within these parameters, furthermore, the trial court may set [aside] a verdict even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. . . . The authority of the trial court to set aside a verdict that is against the weight of the evidence is grounded in the fact that the action of a jury may be as unreasonable, and as suggestive of being produced by improper influences, in passing upon the credibility of witnesses and in the weighing of conflicting testimony, as in any other respect. It is one of the duties of a judge, in the due performance of his [or her] part in jury trials, to see to it that such influences, apparently operating upon the jury, do not prevail, and manifest injustice thereby be done." (Citation omitted; internal quotation marks omitted.) *State* v. *McCarthy*, 105 Conn. App. 596, 600–601, 939 A.2d 1195, cert. denied, 286 Conn. 913, 944 A.2d 983 (2008), quoting *State* v. *Griffin*, 253 Conn. 195, 200–201, 749 A.2d 1192 (2000). "[U]nlike an appellate court, the trial [court] has had the same opportunity as the jury to view the witnesses, to assess their credibility and to determine the weight that should be given to their evidence." (Internal quotation marks omitted.) *State* v. *McCarthy*, supra, 601. Consequently, we review the trial court's decision on a motion for a new trial for abuse of discretion. Id.

Having reviewed the record in the present case, we conclude that the trial court did not abuse its discretion by denying the defendant's motion for a new trial. Notwithstanding certain inconsistencies between the victim's trial testimony and her statement to the police; see footnote 18 of this opinion; a juror nevertheless reasonably could have credited the victim's testimony

regarding the sexual assault.[19] See, e.g., *State* v. *McCarthy*, supra, 105 Conn. App. 604–607 (concluding that trial court properly denied motion for new trial because "[t]he jury . . . was aware of these fabrications, recantations and inconsistencies [in the testimony of a key state witness], and the assessment of a witness' credibility is a function of the jury, not of an appellate court").

Moreover, given the testimony of O, Kozloski, Doolan and Wisnie that the victim was absent from school for the entire day on the day of the assault, the jury had ample opportunity to consider, and reasonably reject, the defendant's proffered evidence of physical impossibility, namely, the Letter Grade report indicating that the victim had been present in school for homeroom. Cf. *State* v. *Whipper*, 258 Conn. 229, 247–49, 780 A.2d 53 (2001) (trial court properly denied motion for new trial because there were explanations for fact that defendant's DNA was not found in blood samples taken from kitchen, including degradation because of environment and blood chemical factors that could have masked its presence), overruled in part on other grounds by *State* v. *Grant*, 286 Conn. 499, 533–35, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). Inasmuch as the trial court had ample opportunity to witness the proceedings and hear firsthand the testimony at trial that was credited by the jury, we decline to disturb the court's discretionary decision to deny the defendant's motion for a new trial.[20]

[19] In particular, we note that the jury reasonably could have found corroborative of the victim's allegations her testimony about the bin of pornographic movies in the defendant's bedroom, a place that she never had been prior to the assault, and the subsequent admission into evidence of a photograph of that bin. The jury also reasonably could have relied on the testimony of T and E concerning the changes in the victim's behavior that took place in the days subsequent to the assault.

[20] We find misplaced the defendant's reliance on *State* v. *Hammond*, 221 Conn. 264, 604 A.2d 793 (1992), which involved the then nascent field of DNA evidence in sexual assault cases. *Hammond* is distinguishable from the present case because it involved exculpatory DNA evidence, the validity of which was not reasonably subject to question on that record, that excluded the defendant therein from having contributed any part of a semen stain

## II

## COMPULSORY PROCESS CLAIMS

The defendant next claims that the state violated his federal and state constitutional rights to compulsory process by failing to give him notice that it had released Stevenson from his subpoena, thus rendering Stevenson unavailable to testify at trial when he then left the jurisdiction for a vacation. The record reveals the following additional facts and procedural history relevant to these claims. On Thursday, April 19, 2007, after the state had rested its case, the trial court denied the defendant's oral motion for a judgment of acquittal and asked the defendant if he was ready to proceed with his case. Defense counsel responded that he had several witnesses to call, but that only one, J, was ready at that time. Defense counsel stated his intention to call numerous teachers from the victim's school, but advised the court that he was unable to have subpoenas served on them because of a school vacation during the week of the trial. He also stated that he had expected the state's

found on the victim's underwear from the date of the assault. Id., 278, 286. In contrast, the Letter Grade attendance system utilized in the present case is not by itself evidence of physical impossibility, but simply is an electronic data recording program subject to human entry error.

Similarly distinguishable is *Palomba* v. *Gray*, 208 Conn. 21, 543 A.2d 1331 (1988), a paternity case relied upon by the defendant in which this court upheld the trial court's grant of the plaintiff's motion for a new trial. In our view, *Palomba* stands only for the proposition that the decision to grant a new trial is a discretionary one that lies primarily with the trial court, which had the opportunity to view the proceedings firsthand. See id., 32–33 (noting trial court's decision was supported by defendant's "conflicting" testimony about his times and places of contact with plaintiff).

Finally, we disagree with the defendant's reliance on *State* v. *Huss*, 506 N.W.2d 290, 292–93 (Minn. 1993), wherein the Minnesota Supreme Court overturned for insufficient evidence the sexual assault conviction of a father accused of assaulting his three year old daughter. *Huss* is distinguishable from this case because the Minnesota court was troubled by the state's "repeated use of a highly suggestive book on sexual abuse," as well as the fact that the victim had recanted her allegations. Id., 292. In contrast, in this case, there was no evidence of improper suggestion, and the victim never denied at any time that she had been sexually assaulted.

presentation of its case-in-chief to last longer, because the state's witness list included several police officers, namely, Wisnie, Barbara Alenckis and Stevenson, that it had not called to testify. Defense counsel then asked the trial court to permit him to call J to testify that day, and then continue the proceedings until Monday, April 23, to allow him time to subpoena the police officers to testify then, and have the teachers subpoenaed to testify the next day, Tuesday, April 24. After learning that the defendant's proposed continuance would pose scheduling problems for several jurors, the trial court continued the case, over the state's objection, to the following Thursday, April 26.

Subsequently, on Tuesday, April 24, defense counsel requested an opportunity to speak with the trial court, which convened a hearing for that afternoon. Defense counsel then advised the court that he had learned that, at some point on the preceding Thursday, April 19, the state had released Stevenson from his subpoena.[21] Defense counsel stated that, when his subpoenas were served on the police officers on Friday, April 20, he was advised that Stevenson had left for a vacation and would not return until Monday, April 30. Defense counsel then requested information from the prosecutor concerning when she had released Stevenson from his subpoena, and also asked for permission to argue that Stevenson, who was "crucial" to the defendant's case, was a missing witness pursuant to *State* v. *Malave*, 250 Conn. 722, 739–40, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000).[22]

---

[21] Defense counsel stated that he last saw Stevenson in the courthouse between 3 and 4 p.m. on April 19. The prosecutor denied having seen Stevenson that day, stating that she did not ask him to be there, so Stevenson must have been present in connection with a different case.

[22] In *State* v. *Malave*, supra, 250 Conn. 728–29, we abandoned, in criminal cases, the missing witness rule, under which a jury was instructed that "[t]he failure of a party to produce as a witness one who [1] is available and [2] . . . naturally would be produced permits the inference that such witness, if called, would have exposed facts unfavorable to the party's cause." (Internal quotation marks omitted.) We emphasized, however, that

After responding to the trial court's questions for defense counsel about the legal basis for his assertion that the state was obligated to notify him prior to releasing Stevenson from the subpoena,[23] defense counsel made a comprehensive offer of proof regarding Stevenson's expected testimony, noting that Stevenson had taken oral and written statements from both the defendant and the victim, and could testify further about the defendant's cooperation during the course of the investigation. The trial court then adjourned the proceedings without ruling on the defendant's request.

Subsequently, on April 27, which was the last day of evidence, the defendant reiterated his request, which the trial court had rejected the day before, to offer into evidence his written statement, which Stevenson had taken on May 5, 2006.[24] The trial court permitted the

trial courts retain discretion to permit counsel to make "appropriate comment, in closing arguments, about the absence of a particular witness, insofar as that witness' absence may reflect on the weakness of the opposing party's case . . . [s]o long as counsel does not directly exhort the jury to draw an adverse inference by virtue of the witness' absence . . . ." Id., 739.

[23] Defense counsel acknowledged that, "it may be that we don't have any legal footing to stand on," but previously had argued that it had "always been a policy of the old time judges . . . that before the state released a witness they made a determination out of courtesy as to whether or not the defense intends to use that particular witness."

[24] The previous day of trial, April 26, defense counsel had questioned Wisnie about whether a police officer had taken the statement of the defendant during their investigation. In response to the prosecutor's objection to that question, defense counsel again noted Stevenson's absence from the trial. The trial court then sustained the state's objection, concluding that the defendant's questions called "for pure hearsay." Defense counsel then raised the still unresolved issue of whether he would be permitted to refer to Stevenson's absence as a factor contributing to the weakness of the state's case.

Defense counsel then stated his "offer of proof . . . that . . . Stevenson if he's available would have been able to testify as to the calling [of] the defendant down to the police station the early afternoon of May 5, 2006, and talking to the defendant and taking an oral statement from him as to his whereabouts on May 1 and what he did with [the victim] . . . on May 1 as far as picking her up and taking her to school and then dropping her off and receiving a cell phone call from her later in the after—early afternoon, wanting to be picked up and going to school and picking her up. That would have been admissible through Stevenson.

defendant to make an offer of proof and to mark a copy of his statement for identification, although it had concluded the day before that the defendant's statement was inadmissible under the evidentiary rule set forth in *State* v. *Stepney*, 191 Conn. 233, 254, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984).[25] See also footnote 24 of this opinion.

"Also, testimony as to his voluntarily giving . . . Stevenson a saliva sample and also . . . Stevenson took a statement of [the victim], and it's our position that he had a—there's a number of—there would have been a great deal of testimony referenced to his giving her—taking the statement from her that would have contradicted her testimony as to how the statement was taken and whether he put words in her mouth or didn't put words into her mouth . . . .

"So it's our position that he's a very crucial witness and he's the only witness who took the written statement from [the victim] and he's also the only witness who took an oral statement.

"There may be evidence tomorrow from—if the court allows it—from . . . Alenckis that she took a written statement from the defendant on June 14, 2006, but . . . Stevenson's testimony is still very important to the case, and we feel that we should be able to comment on the state's failure to call him, especially under the circumstances where the state released him from their subpoena without letting us know that [it] was releasing him from [its] subpoena, so that we could have guaranteed that he would have been here at a reasonable time.

"And we would cite [*State* v. *Malave*, supra, 250 Conn. 722], for the proposition that the court can [in] its discretion have an evidentiary hearing to determine the issue of the missing witness if there's a claim of the state that it's not [the state's] fault that he's missing."

In response, the prosecutor argued that Stevenson's testimony would be cumulative, and also that the defendant's out-of-court statements could not be admitted through Stevenson as an alternative to in-court testimony. The prosecutor concluded by arguing that the court "certainly has the right to indicate it's not going to have another delay for nonessential cumulative evidence." After rebuttal argument from defense counsel to the effect that this court's decision in *State* v. *Stepney*, 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984); see footnote 25 of this opinion; should be extended to permit the defendant to introduce his own written statement, the trial court concluded that the defendant's statement was inadmissible.

[25] In *State* v. *Stepney*, supra, 191 Conn. 254, this court concluded that, even if the defendant chooses not to testify at trial, the state could introduce into evidence "statements voluntarily made to agents of the government or of statements made to third parties" because there is "no persuasive reason why the privilege [against self-incrimination] should be thus enlarged to exclude from the trier of fact, at the option of the defendant, reliable and probative evidence of voluntary statements made by the defendant." Accord

Defense counsel then argued that the state's strategic decision not to introduce the teachers' testimony, as well as its decision not to elicit the testimony of the police officers in conjunction with its reliance on the *Stepney* rule, as incorporated into § 8-3 (1) (A) of the Connecticut Code of Evidence, constituted prosecutorial impropriety. In response, the state argued that it could not present its case through statements without subjecting its witnesses, including the victim, to cross-examination, and that it was "under the same constraints as a defense in that regard." The state further argued that it had provided all exculpatory matter to the defense earlier in the proceedings. The trial court concluded that it did not find any evidence of prosecutorial impropriety.[26]

After the trial court canvassed the defendant concerning his decision not to testify on his own behalf, and discussed the jury charge with the parties, defense counsel then asked the trial court about the scope to which it would permit argument with respect to the state's failure to present certain witnesses. The prosecutor argued, however, that it was concerned about having to prove a negative, in that the jury did not hear "about what investigation may or may not have been done or wasn't done." In response, the defendant argued that it was a "tactical decision [the prosecutor] made that the court says is not prosecutorial impropriety . . . . [The prosecutor] can't have her cake and eat it too. [The prosecutor] released the witnesses and I tried to present them as best I can, and I don't believe—*I don't have the temerity to ask the court to continue this trial*

---

Conn. Code Evid. § 8-3 (1) (A) (permitting admission into evidence of "[a] statement that is being offered against a party and is . . . the party's own statement").

[26] The defendant also argued that the *Stepney* rule, as incorporated into § 8-3 (1) (A) of the Connecticut Code of Evidence, was an unconstitutional infringement on his right not to testify at trial. The trial court rejected this claim, which the defendant does not renew on appeal.

*[until] Monday* to have—because . . . Stevenson will be here . . . and it looks like from the court's rulings, *most of what he did is already into evidence, although the issue of the statement of the defendant is not in evidence, but it is in evidence through other witnesses.*

"Just like the saliva sample can be testified to . . . as being done voluntarily because that's in evidence through some of the witnesses . . . it's a situation the state has created . . . ." (Emphasis added.) The trial court permitted the defendant to argue a lack of evidence, but not to suggest that the state was "hiding" or "[c]oncealing evidence," and emphasized further that the defendant could not argue that the state had an obligation to produce a certain witness, or "argue . . . because the state didn't bring in certain witnesses," that, as defense counsel stated, "they're hiding something."[27]

The parties then proceeded to give their summations. Following the jury's verdict, the defendant renewed this claim in a written motion for a new trial as a federal due process violation, contending that the prosecutor's actions were unethical and resulted in the trial court depriving him of his right to a fair trial.

A

Federal Compulsory Process Claims

The defendant first claims that the state violated his right to compulsory process under the sixth amendment to the United States constitution. See footnote 1 of this opinion. Specifically, the defendant contends that he is entitled to a new trial because the prosecutor's release

---

[27] During this exchange, after the trial court stated its intention to give "counsel a wide swath on argument," the prosecutor noted her "concern [that] if [defense counsel] is going to be making claims about me not presenting certain witnesses, he has equal power to have presented them." Defense counsel again emphasized that he did not "have equal powers to the witness, because [Stevenson is] gone because of what [the prosecutor] did. I don't have equal powers."

of Stevenson from his subpoena without first notifying the defendant constituted " 'substantial interference' " with Stevenson's ability to testify.[28] In response, the state relies on, inter alia, *State* v. *Estrella*, 277 Conn. 458, 893 A.2d 348 (2006), and *State* v. *Rawls*, 198 Conn. 111, 502 A.2d 374 (1985), and contends that the defendant has failed to prove a violation of his right to compulsory process because Stevenson's absence was not the product of state action and, most significantly, the defendant failed to seek a second continuance of the trial for purposes of exercising his subpoena rights pursuant to General Statutes § 52-143[29] upon Stevenson's return to the jurisdiction. We agree with the state and conclude that the prosecutor's release of Stevenson from his subpoena did not violate the defendant's federal right to compulsory process.

---

[28] Our review of the record reveals that the defendant did not raise his federal compulsory process claim at trial, choosing instead to focus on obtaining permission to make a missing witness argument pursuant to *State* v. *Malave*, supra, 250 Conn. 722, and to raise a due process prosecutorial impropriety claim in his posttrial motions. Further, in his principal brief, the defendant does not seek review of any unpreserved federal constitutional claims pursuant to the bypass procedure of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Ordinarily, this would preclude review of his federal constitutional claims based on the compulsory process clause, which were not raised at trial. See, e.g., *Lebron* v. *Commissioner of Correction*, 274 Conn. 507, 532, 876 A.2d 1178 (2005). Because the defendant has, however, properly requested *Golding* review of his state constitutional claims in his brief, we will exercise our discretion to review his federal constitutional claims pursuant to *Golding*, as well.

[29] General Statutes § 52-143 provides in relevant part: "(a) Subpoenas for witnesses shall be signed by the clerk of the court or a commissioner of the Superior Court and shall be served by an officer, indifferent person or, in any criminal case in which a defendant is represented by a public defender or special assistant public defender, by an investigator of the Division of Public Defender Services. The subpoena shall be served not less than eighteen hours prior to the time designated for the person summoned to appear, unless the court orders otherwise.

"(b) Any subpoena summoning a police officer as a witness may be served upon the chief of police or any person designated by the chief of police at the appropriate police station who shall act as the agent of the police officer named in the subpoena. Service upon the agent shall be deemed to be service upon the police officer. . . ."

"The federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . .

"The right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to countervailing public interests . . . such as the state's responsibility for arresting and prosecuting suspected criminals. . . . *To establish a violation of the right to present a defense based on lost evidence, a defendant must show that the evidence was material and exculpatory, and that it was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. . . . Moreover, unless the defendant can show bad faith on the part of the state, failure to preserve potentially useful evidence does not constitute a denial of due process of law. . . .* Finally, the misconduct must demonstrate that the absence of [fundamental] fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Estrella,* supra, 277 Conn. 487–88; see also *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982) ("[The] respondent cannot establish a violation of his constitutional right to compulsory process merely by showing that deportation of the passengers deprived him of their testimony. He must at least make some plausible showing of how their testimony would have been both mate-

rial and favorable to his defense."); *State* v. *Estrella,* supra, 479, 485–88 (tape recordings of defendant's admissions of murder to his cell mate, who had been deported prior to trial, could be admitted without violating defendant's compulsory process right because there were no authentication issues, facts of cell mate's criminal history and consideration for his help were admitted through cross-examination of federal officers, and defendant could not identify other exculpatory or impeachment evidence to be elicited from cell mate's in-court testimony).

Moreover, a defendant may not successfully establish a violation of his rights to present a defense and to compulsory process without first taking reasonable steps to exercise those rights. See *State* v. *Lubesky,* 195 Conn. 475, 478–80, 488 A.2d 1239 (1985) (rejecting compulsory process claim arising from inability to find state witness who already had testified because defendant failed to request continuance or move for mistrial); *Schwartzmiller* v. *State,* 108 Idaho 329, 330–31, 699 P.2d 429 (App. 1985) ("defendant's diligence in exercising his sixth amendment right" is "relevant factual [inquiry]"); *State* v. *Timblin,* 254 Mont. 48, 50, 834 P.2d 927 (1992) (noting "defendant's diligence in exercising [s]ixth [a]mendment rights" forms part of compulsory process inquiry). To exercise his sixth amendment compulsory process rights diligently, a defendant is required to utilize available court procedures, such as the issuance of subpoenas, as well as requests for continuances or material witness warrants that may be reasonably necessary to effectuate the service process. See, e.g., *United States* v. *Desena,* 287 F.3d 170, 176 (2d Cir. 2002); *State* v. *Lubesky,* supra, 480; *People* v. *Henderson,* 133 Ill. App. 2d 336, 343, 273 N.E.2d 244 (1971); *State* v. *Green,* 448 So. 2d 782, 786–87 (La. App. 1985); *Young* v. *State,* 191 P.3d 601, 606–607 (Okla. Crim. App. 2008); *Dean* v. *Commonwealth,* 30 Va. App. 49, 56–57, 515

S.E.2d 331 (1999); accord *State* v. *Rawls*, supra, 198 Conn. 119 (rejecting confrontation clause challenge to toxicological report because defendant's "rights were adequately protected by the available procedures for pretrial discovery . . . and subpoenaing of the witness[es] during trial," as well as motions to strike or for "a continuance to allow an opportunity to subpoena the individuals who actually performed the tests" [citation omitted; internal quotation marks omitted]).

We conclude that the prosecutor's release of Stevenson from his subpoena did not violate the defendant's sixth amendment right to compulsory process. Specifically, there is no evidence that the prosecutor released Stevenson from his subpoena in bad faith or with the knowledge that Stevenson would then be unable to testify at the remainder of the trial. See *Buie* v. *Sullivan*, 923 F.2d 10, 12 (2d Cir. 1990) ("[s]peculation . . . does not permit a determination of bad faith on the part of the prosecutor"). Moreover, given the fact that the trial court had ruled the defendant's voluntary statement inadmissible under *State* v. *Stepney*, supra, 191 Conn. 233, Stevenson's testimony was not critically important because the defendant himself had acknowledged that both inconsistencies in the victim's statement and Stevenson's actions during the investigation already had been admitted into evidence through other witnesses. Compare *Buie* v. *Sullivan*, supra, 11–12 (no sixth amendment violation when arrest rendering witness unavailable was based on probable cause, and witness' exculpatory statements were admitted through testimony of police officer), with *Singleton* v. *Lefkowitz*, 583 F.2d 618, 623–25 (2d Cir. 1978) (defendant's compulsory process rights were violated when government released from custody material witness, who previously had failed to appear in response to defendant's subpoena, and whose testimony could have rebutted defendant's involvement in drug transaction, and trial court had

denied defendant's motion for additional continuance to secure witness' presence at trial), cert. denied sub nom. *Abrams* v. *Singleton*, 440 U.S. 929, 99 S. Ct. 1266, 59 L. Ed. 2d 486 (1979).

Finally, the defendant's lack of diligence in exercising his sixth amendment rights also leads us to reject his federal compulsory process claim. Even assuming that the defendant reasonably relied on Stevenson's presence on the state's witness list, rather than subpoenaing him at the start of trial, after the defendant unsuccessfully attempted to subpoena Stevenson during the trial, he nevertheless failed to attempt to seek the continuance that would be necessary to secure Stevenson's live testimony, stating at one point that he lacked the "temerity" to do so.[30] This omission is a significant factor in concluding that the defendant's federal compulsory process rights have not been violated by the prosecutor's release of Stevenson from his subpoena. See, e.g., *State* v. *Green*, supra, 448 So. 2d 786–87 (no compulsory process violation when state excused witness from subpoena before trial, and defendant thereafter requested issuance of new subpoena, but did not attempt to serve it; after verdict, defendant raised issue of witness' release from subpoena in motion for new trial, issued another subpoena for witness, but even after continuance granted, failed to serve subpoena); *Dean* v. *Commonwealth*, supra, 30 Va. App. 56–57 (no compulsory process violation when prosecutor

---

[30] The defendant argues in his reply brief that his failure to seek a continuance is relevant, but not fatal to his claim, particularly given the fact that the trial court previously had expressed hesitation to continue the trial from April 19 to April 30. Although we agree that the failure to seek a continuance is not by itself fatal, it is nevertheless significant given the lack of evidence of bad faith on the part of the prosecutor and the fact that Stevenson's testimony would have been cumulative and otherwise of limited value. Most importantly, a continuance in the present case likely would have provided the defendant with the opportunity to examine Stevenson, unlike in those cases wherein witnesses were rendered completely unavailable by actions such as deportation.

released witness from subpoena because defendant did not issue his own subpoena or request "a continuance in order to obtain the presence of the witnesses at trial"); cf. *United States* v. *Desena,* supra, 287 F.3d 176 ("[s]eeking only a missing witness charge was a strategic decision, and having failed to secure an acquittal, [the defendant] cannot now complain that other, unrequested remedies should have been granted sua sponte by the trial court").[31] Thus, we conclude that the defendant has failed to establish that the prosecutor's release of Stevenson from his subpoena constituted a federal compulsory process violation.[32]

---

[31] See also *United States* v. *Desena,* supra, 287 F.3d 176 ("[m]ore important, [the defendant] has not shown [that the detective] could not have been located had the defense requested a continuance"); *State* v. *Lubesky,* supra, 195 Conn. 480 (rejecting compulsory process claim arising from defendant's inability to find and recall state witness because defendant failed to request continuance or move for mistrial); *People* v. *Henderson,* supra, 133 Ill. App. 2d 343 ("[t]he defendant clearly waived his right to compulsory process by demanding immediate trial and by not requesting a continuance in order to find and properly subpoena the witnesses"); *Young* v. *State,* supra, 191 P.3d 606–607 (unsatisfied request for appearance of state witnesses released subject to recall did not violate compulsory process rights because defendant "did not seek a continuance, ask for bench warrants to arrest the witnesses, or request that the witnesses be transported to [c]ourt by the [s]heriff").

[32] The defendant argues that numerous "federal courts—including the United States Supreme Court—have reversed convictions and ordered new trials where the government 'substantially interfered' with the ability of a defense witness to testify." The cases that he cites are, however, inapposite because they do not involve a witness that is unable to testify because of subpoena complications, but rather are cases of inappropriately strong perjury warnings, or otherwise coercive comments by judges, prosecutors or government agents that intimidated otherwise willing defense witnesses into declining to testify. See *Webb* v. *Texas,* 409 U.S. 95, 97–98, 93 S. Ct. 351, 34 L. Ed. 2d 330 (1972) (per curiam) (warning by trial judge); *United States* v. *Edmond,* 63 M.J. 343, 349–50 (C.A.A.F. 2006) (warning by court-martial prosecutor); *United States* v. *Vavages,* 151 F.3d 1185, 1189–90 (9th Cir. 1998) (warning by prosecutor); *United States* v. *Heller,* 830 F.2d 150, 152–54 (11th Cir. 1987) (Internal Revenue Service agent coerced accountant into testifying falsely at defendant's trial); *United States* v. *Hammond,* 598 F.2d 1008, 1012–13 (5th Cir. 1979) (warning by Federal Bureau of Investigation agent); *United States* v. *Morrison,* 535 F.2d 223, 227–28 (3d Cir. 1976) (warning by prosecutor).

B

## State Compulsory Process Claims

Supplying a complete state constitutional analysis pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), the defendant next claims that the state's release of Stevenson from his subpoena violated his compulsory process rights under article first, § 8, of the Connecticut constitution. See footnote 2 of this opinion. Most significantly, the defendant relies on this court's interpretation of that provision's due process clause in *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), as well as *Montgomery* v. *State*, 804 N.E.2d 1217 (Ind. App.), transfer denied, 822 N.E.2d 976 (Ind. 2004), and *People* v. *Perez*, 255 Mich. App. 703, 662 N.W.2d 446, vacated in part on other grounds, 469 Mich. 415, 670 N.W.2d 655 (2003), in support of a state constitutional rule requiring prosecutors to provide criminal defendants with prior notice when they intend to release a witness from subpoena, regardless of whether the prosecutor has knowledge of that witness' pending unavailability. In response, the state contends that this claim is unpreserved and that the record is inadequate for review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state also relies on *State* v. *Estrella*, supra, 277 Conn. 488–89, and contends that the state compulsory process clause should be interpreted consistently with its sixth amendment counterpart. We agree with the state and conclude that the prosecutor's release of Stevenson from his subpoena did not violate the defendant's right to compulsory process under article first, § 8, of the state constitution.

We begin with the reviewability of the defendant's state constitutional claim. Although we disagree with the defendant that he preserved this claim in his arguments to the trial court, none of which mentioned a state constitutional claim, we will grant his request and

review this claim pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, under which "a defendant may prevail on unpreserved claims only if: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Foreman*, 288 Conn. 684, 692–93 n.6, 954 A.2d 135 (2008). Notwithstanding the state's argument to the contrary, we conclude that the transcript is adequate to determine the historical basis of the events that occurred during the trial of the present case, leaving any evidentiary failures for consideration under the third prong of *Golding*, namely, whether the defendant proved the clear existence of a constitutional violation that deprived him of a fair trial.[33]

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of pro-

---

[33] The state relies on *State* v. *Lubesky*, supra, 195 Conn. 475, in support of its argument that the record is inadequate for review of the defendant's claim, which is based on the premise that the prosecutor released Stevenson from his subpoena with the knowledge that he would leave the jurisdiction and be unavailable to testify. We disagree with the state's reliance on *Lubesky*, however, because that case did not turn on the adequacy of the record but, rather, involved a determination on the merits of a claim that the state had violated the defendant's due process rights by deliberately concealing a witness, thereby precluding the defendant from recalling the witness. See id., 480 ("Absent an evidentiary hearing on this issue, the claim is extremely difficult to review. The defendant has failed to show on this record that the state knew anything more than he did as to [the witness'] whereabouts.").

tection for such rights. . . . Furthermore, although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies."[34] (Internal quotation marks omitted.) *State* v. *McKenzie-Adams*, 281 Conn. 486, 509–10, 915 A.2d 822, cert. denied, 552 U.S. 888, 128 S. Ct. 248, 169 L. Ed. 2d 148 (2007).

As the state observes, this case is not our first opportunity to consider the contours of the state constitution's compulsory process clause. In *State* v. *Estrella*, supra, 277 Conn. 488–89, we recently concluded that

[34] "The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party— the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . Finally, not every *Geisler* factor is relevant in all cases." (Citation omitted.) *State* v. *Morales*, supra, 232 Conn. 716 n.10.

the state compulsory process provision did not provide greater protections than did the federal constitution with respect to a criminal defendant's inability to subpoena a witness who had been deported by the federal government. Discussing the textual and historical factors, we concluded that there is no such "basis for assigning independent meaning to our state constitutional provision." Id., 489; see also id., 489 n.19 (noting "slight textual difference in the two provisions" but "fail[ing] to see how this difference would have any practical effect"). We also noted that the defendant in *Estrella* had not pointed us to any Connecticut or sister state case law that supported his request for enhanced protection under the state constitution and had "advanced no compelling policy considerations to warrant a broader reading of the state compulsory process clause." Id., 489.

In his briefs, the defendant in the present case does not, however, ask us to overrule or limit *Estrella*. He does, however, rely on the independent state due process analysis from *State* v. *Morales*, supra, 232 Conn. 707, in support of his argument that "the state constitution offers defendants vast protections regarding the calling of witnesses—even greater than those offered by the federal constitution—to ensure that defendants may adequately defend themselves against criminal charges." In *Morales*, in considering whether the state's failure to preserve potentially useful evidence, specifically a jacket worn by a sexual assault victim that had contained semen stains from the attack, violated a defendant's due process right to a fair trial, we followed the vast majority of our sister states that have considered the issue under their own constitutions, and rejected the federal "bad faith" standard articulated in *Arizona* v. *Youngblood*, 488 U.S. 51, 57–58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).[35] *State* v. *Morales*, supra,

---

[35] "The [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment, as interpreted in *Brady* [v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d

726–27. In so concluding, this court performed a complete *Geisler* analysis and elected to continue applying, as a matter of state constitutional law, the balancing test from *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985),[36] that had been utilized prior to the United States Supreme Court's decision in *Youngblood*.[37] *State* v. *Morales*, supra, 719–20.

We conclude that *Morales* does not alter our conclusion in *Estrella* that Connecticut case law does not support a broader reading of the state compulsory process clause. *Morales* is readily distinguishable from the present case with respect to the permanency of the unavailability of the evidence or testimony at issue and, therefore, the ultimate fairness of the defendant's trial. Put differently, this case does not involve the destruc-

215 (1963)], makes the good or bad faith of the [s]tate irrelevant when the [s]tate fails to disclose to the defendant material exculpatory evidence. But we think the [d]ue [p]rocess [c]lause requires a different result when we deal with the failure of the [s]tate to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. . . . [U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (Citations omitted.) *Arizona* v. *Youngblood*, supra, 488 U.S. 57–58.

[36] Under the *Asherman* balancing test, "the trial court must . . . [weigh] the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 232 Conn. 727.

[37] We emphasized that "[f]airness dictates that when a person's liberty is at stake, the sole fact of whether the police or another state official acted in good or bad faith in failing to preserve evidence cannot be determinative of whether the criminal defendant has received due process of law. Rather, our constitution imposes certain obligations on the state to ensure that the criminal trial is 'a search for truth, not an adversary game.' " *State* v. *Morales*, supra, 232 Conn. 723.

tion, disposal or total loss of evidence but, rather, temporary witness unavailability that, as a constitutional matter, is attributable to the defendant's own failure to take the action necessary to exercise the rights provided him under the state compulsory process clause, either by issuing his own subpoenas prior to trial pursuant to § 52-143, or attempting to seek a continuance during trial, to enable that action.

Turning to the other *Geisler* factors, the defendant has not pointed to, and our independent research has not disclosed, any decisions wherein the courts of our sister states have construed their state constitutions as providing greater protections with respect to the prosecution's release from subpoena of one of its witnesses.[38] Thus, the two decisions that the defendant does cite, *Montgomery* v. *State*, supra, 804 N.E.2d 1217, and *People* v. *Perez*, supra, 255 Mich. App. 703, are considered more appropriately under the public policy factor, which encompasses "economic/sociological considerations." *State* v. *Geisler*, supra, 222 Conn. 685. In *Montgomery*, an arson case, the state rested its case without calling two insurance company investigators, whose reports contradicted in part the findings of the police, and then released them from subpoena, leaving the defendant unable to subpoena them himself in time to testify at trial. *Montgomery* v. *State*, supra, 1220. The court concluded that the failure of the defendant's trial counsel to seek a continuance to subpoena the investigators for live testimony, rather than reading a deposition into evidence, was constitutionally ineffective assistance because the case against the defendant was entirely circumstantial and amounted to a battle of the experts. Id., 1221–22. The court, did, however, admonish the prosecutor for his failure to "inform [the defendant], whose witness list included those witnesses

[38] In his *Geisler* analysis, the defendant does not claim support from federal case law construing the sixth amendment's compulsory process clause.

listed by the [s]tate . . . or seek permission from the trial court to release the witnesses from the court's subpoena." (Citation omitted.) Id., 1222 n.6. While not attributing its decision to any particular legal source, the court stated that, under Indiana law, "once a witness is served with a subpoena, the witness is under court order to appear, and cannot be unilaterally dismissed without permission from the court that issued the subpoena. Further, given the substantial time and cost that go towards service of process, duplicative service of subpoenas is unnecessary and unwarranted when one party has clearly served the subpoena prior to trial."[39] Id.

As a practical matter, we agree with the defendant that it would be an efficient best practice for the prosecutor to notify both the court and the defendant prior to releasing its witnesses from subpoena, particularly if there is a likelihood that the witnesses will become unavailable to be subpoenaed by the defendant later in the trial. This procedure is not, however, presently required by statute or a rule of practice, and we decline to implement it as a rule of state constitutional law, given that the defendant's compulsory process rights

---

[39] The Michigan Court of Appeals' decision in *People* v. *Perez*, supra, 255 Mich. App. 703, is not, however, as illuminating as the Indiana Court of Appeals' decision in *Montgomery* v. *State*, supra, 804 N.E.2d 1217. Specifically, in *Perez*, the court rejected a criminal defendant's claim that he was entitled to a jury instruction that a prosecution witness who failed to honor his subpoena "would have testified favorably to the defendant." *People* v. *Perez*, supra, 709–10. Discussing a statute that, inter alia, expressly precluded prosecutors from changing their disclosed witness lists without leave of the court, the court noted the lack of penalties provided therein, and stated that the statute imposes "no obligation . . . upon the prosecutor . . . beyond subpoenaing witnesses, either the prosecution's own or those requested by the defendant," and that "the prosecutor may not excuse a witness from honoring the subpoena without leave of the court. That is, the defendant may rely on the appearance of a witness on the prosecutor's witness list without further need to subpoena that witness himself." Id., 710, discussing Mich. Comp. Laws Serv. § 767.40a (3) and (4) (LexisNexis 2002). The court did not, however, explain the public policy rationale behind the statute at issue.

already are protected by existing statutes and court procedures, including § 52-143, as well as the potential availability of continuances in the case of temporarily missing material witnesses. Thus, with only one of the *Geisler* factors providing any support at all for the defendant's claim, and the defendant having failed to avail himself of existing procedures to attempt to secure Stevenson's presence, we conclude that the state constitution's compulsory process clause does not provide him with greater protection in the present case.

### III

### PROSECUTORIAL IMPROPRIETY CLAIMS

We next address the defendant's claim that prosecutorial impropriety deprived him of his constitutional right to a fair trial. Specifically, he claims that the prosecutor improperly: (1) acted intentionally to render Stevenson, a critical defense witness, unavailable to testify during trial; and (2) during closing argument, expressed "her opinion regarding the [victim's] character, the [victim's] veracity, and, ultimately, what the evidence at trial demonstrated."

### A

### The Prosecutor's Release of Stevenson from Subpoena

We first consider whether the prosecutor's actions regarding the release of Stevenson from the subpoena constituted prosecutorial impropriety. The defendant relies on the venerable rule of *State* v. *Guilfoyle*, 109 Conn. 124, 145 A. 761 (1929), and *State* v. *Mitchell*, 169 Conn. 161, 362 A.2d 808 (1969), overruled in part on other grounds by *State* v. *Graham*, 200 Conn. 9, 509 A.2d 493 (1986), and contends that the prosecutor "shirked her responsibility to bring forth every relevant witness before the trial court," and also "intentionally and overtly prevented [the defendant] from, himself,

placing the truth before the jury."[40] Notwithstanding the lack of evidence of bad faith on the part of the prosecutor; see part II of this opinion; we agree, however, with the state that subsequent case law has made clear that the *Guilfoyle* rule is one of disclosure, akin to that of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and that there was no *Guilfoyle* violation because the defendant was aware of Stevenson and the potential substance of his testimony, and could have taken action to procure his testimony. See *State* v. *Mitchell*, supra, 165; see also *State* v. *Johnson*, 57 Conn. App. 156, 161–62, 748 A.2d 334 (prosecutor complied with rule by disclosing information that victim had given defendant permission to visit her room after sexual assault, and did not have "a further duty to present that information to the trier of fact when the defendant failed to offer the evidence to the jury"), cert. denied, 253 Conn. 912, 754 A.2d 162 (2000); *State* v. *Jurgensen*, 42 Conn. App. 751, 762, 681 A.2d 981 ("the state is not under an obligation to call every competent witness to testify"), cert. denied, 239 Conn. 931, 683 A.2d 398 (1996). Accordingly, we conclude that the state had no obligation to call Stevenson to the stand under *Guilfoyle*, and that the state satisfied its disclosure obligation, as there is no dispute that the defendant was fully aware of the potential substance of Stevenson's anticipated testimony and, indeed, was able to make comprehensive offers of proof about it, and then ultimately determine that it had been covered by the testi-

[40] In *State* v. *Guilfoyle*, supra, 109 Conn. 134, this court had concluded that "the duty of the representative of the [s]tate dictates that the testimony of every available witness tending to aid in ascertaining the truth as to facts relevant to the inquiry be laid before the trial court, irrespective of whether it be consistent with the contentions of the prosecution." This rule was founded on the now defunct; see, e.g., *State* v. *Graham*, supra, 200 Conn. 17; common-law rule precluding parties from impeaching the testimony and character of their own witnesses, but permitting them to prove the facts to be different by introducing alternative testimony.

mony of the other police officers.[41] See footnotes 23 and 24 of this opinion and the accompanying text.

## B

### Claims Arising from Certain Remarks by the Prosecutor during Closing Arguments

The defendant next claims that, during closing arguments, the prosecutor improperly expressed her personal opinion regarding the victim's character and veracity and, ultimately, what the evidence at trial demonstrated. It is well settled that unpreserved claims that prosecutorial impropriety deprived a defendant of a fair trial are reviewed in two separate steps, the first of which is to ascertain whether impropriety occurred in the first instance, and the second of which is to determine whether that impropriety deprived the defendant of his due process right to a fair trial. See, e.g., *State* v. *Angel T.*, 292 Conn. 262, 274–75, 973 A.2d 1207 (2009); *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987).

The defendant first challenges the prosecutor's observations regarding the victim's courage, namely, that, "I would submit *she testified bravely*"; and (2) "[w]hen you look at [the victim's] testimony, I submit to you that it will show you not only is she a *courageous girl* to have stood up within her family and pointed an accusing finger at her uncle, but that her testimony's credible and it is corroborated . . . ." (Emphasis added.) The state effectively concedes that these two comments were improper emotional appeals to the jury's sympathies. See, e.g., *State* v. *Ceballos*, 266 Conn. 364, 395–96, 832 A.2d 14 (2003). Accordingly, we con-

---

[41] Moreover, to the extent that Stevenson's testimony was necessary to introduce the statement of the defendant, that statement was itself held inadmissible under *State* v. *Stepney*, supra, 191 Conn. 233, a point that the defendant does not contest on appeal.

sider subsequently their impact on the fairness of the defendant's trial. See part III C of this opinion.

The defendant next challenges the propriety of the prosecutor's statement during rebuttal argument that, "I don't ask for any excuses for [the victim's] testimony. I don't believe she needs any. I believe she told you what happened. She was accurate here in the courtroom. She was as accurate as she could be in her written statement and her story remains the same." The defendant contends that this statement was an improper expression of the prosecutor's personal belief about the veracity of the victim as a witness. We disagree.

It is well settled that "[a] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . .

"Although prosecutors generally should try to avoid using phrases that begin with the pronoun I, such as I think or I believe, we recognize that the use of the word I is part of our everyday parlance and . . . because of established speech patterns, it cannot always easily be eliminated completely from extemporaneous elocution. . . . Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of

giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute [impropriety]." (Citations omitted; internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 435–36, 902 A.2d 636 (2006).

Viewing the prosecutor's comment in context, we agree with the state that, it "is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge . . . ." Id., 436. This statement simply operated to rebut the portion of the defendant's summation emphasizing the inconsistencies between the victim's statement and her trial testimony, and is consistent with the rule permitting "[a] prosecutor . . . properly [to] comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial."[42] (Internal quotation marks omitted.) Id., 438.

## C

### Due Process Analysis

We now apply the well established six factor analysis from *State* v. *Williams*, supra, 204 Conn. 540,[43] to deter-

---

[42] The defendant also challenges, in passing, two additional remarks made by the prosecutor during her closing argument where, he contends, she expressed her personal belief regarding what the evidence demonstrated, namely: (1) "I believe that the evidence will show you [*the victim*] *had no reason to lie*"; and (2) "I believe that you've heard sufficient evidence *to make a decision on whether or not there was a sexual assault in this case* by [the defendant] to [the victim] her—his niece." (Emphasis added.)

Read in context, both of these statements " '[reflect] reasonable inferences from the evidence adduced at trial' "; *State* v. *Luster*, supra, 279 Conn. 438; and the jury "could not have mistaken [them] for an expression of the prosecutor's personal belief in the defendant's guilt." Id., 437. Moreover, "the state may properly argue that the witnesses had no apparent motive to lie." (Internal quotation marks omitted.) Id., 438. This argument was proper, particularly when the defendant's theory of the case was, in part, that the victim had framed him in response to threats that he had made in an attempt to discipline the victim for poor school attendance.

[43] "Under the well established analysis of *State* v. *Williams*, supra, 204 Conn. 540, we consider: (1) the extent to which the [impropriety] was invited

mine whether the state has established beyond a reasonable doubt that the prosecutorial impropriety, namely, the prosecutor's description of the victim as courageous and brave, did not deprive the defendant of a fair trial. See *State* v. *Angel T.*, supra, 292 Conn. 287–88. This analysis requires us to "view the prosecutor's comments in the context of the entire trial" and determine "whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) Id., 287.

With respect to the first *Williams* factor, the state concedes that the defendant did not invite the impropriety. Regarding the second factor, namely, the severity of the impropriety, it is well settled that a defendant's failure to object or to seek curative measures at trial supports the state's contention that the impropriety was not severe. Id., 289. "Defense counsel's failure to object at trial is, however, not by itself fatal to a defendant's claim . . . . Thus, the apparent lack of severity with respect to the impropriety is counterbalanced in part by the third *Williams* factor, namely, the frequency of the [impropriety] . . . ." (Citations omitted; internal quotation marks omitted.) Id. Having reviewed the record, we conclude that the improper remarks were infrequent in nature, occurring only twice during closing arguments. See, e.g., *State* v. *Johnson*, 107 Conn. App. 188, 195–96, 203, 944 A.2d 416 (two instances of improper argument not frequent), cert. denied, 288 Conn. 905, 953 A.2d 650 (2008); *State* v. *Jose G.*, 102 Conn. App. 748, 767, 929 A.2d 324 (2007) (four improper questions not frequent), aff'd, 290 Conn. 331, 963 A.2d

by defense conduct or argument; (2) the severity of the [impropriety]; (3) the frequency of the [impropriety]; (4) the centrality of the [impropriety] to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Angel T.*, supra, 292 Conn. 287.

42 (2009). Moreover, the two improper remarks were isolated to a discrete part of the trial, both occurring during the prosecutor's principal summation. Cf. *State v. Warholic*, 278 Conn. 354, 398, 897 A.2d 569 (2006) ("the instances of prosecutorial [impropriety] were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments").

The fourth *Williams* factor, "the centrality of the [impropriety] to the critical issues in the case"; *State v. Williams*, supra, 204 Conn. 540; supports the defendant, as comments implying that the victim testified truthfully or otherwise supporting her credibility are particularly significant, as "without independent physical evidence to prove that the defendant had sexually assaulted [the victim], or even that [the victim] had been sexually assaulted at all, the significance of the [prosecutor's] improper conduct increases considerably." *State v. Ceballos*, supra, 266 Conn. 416–17.

With respect to the fifth factor, namely, "the strength of the curative measures adopted"; *State v. Williams*, supra, 204 Conn. 540; the state concedes that the trial court did not employ any corrective measures directed specifically at the improper remarks, but did give a general instruction to the jury, explaining its role and its sole power to decide facts and determine credibility. Although " 'a general instruction does not have the same curative effect as a charge directed at a specific impropriety' "; *State v. Warholic*, supra, 278 Conn. 401; when a defendant, as here, fails to object at trial, he "bears much of the responsibility for the fact that these claimed improprieties went uncured," especially because "defense counsel's failure to object to the prosecutor's argument . . . when [they were] made suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time. . . . Moreover . . . defense counsel may elect not to object to

arguments . . . that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to [them] or because he or she wants to later refute that argument . . . . The same principles hold true in regard to requests for special instructions. The failure by the defendant to request specific curative instructions frequently indicates on appellate review that the challenged instruction did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Angel T.*, supra, 292 Conn. 291.

Finally, we consider the sixth *Williams* factor, namely, "the strength of the state's case." *State* v. *Williams*, supra, 204 Conn. 540. "[W]e have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Angel T.*, supra, 292 Conn. 293. We disagree with the defendant's reliance on the school attendance records and the testimony of the victim's homeroom teachers, who created them, in support of his contention that the state's case was not strong because there was evidence that the victim was present at school at the time of the assault. As previously discussed, the jury reasonably could have relied on the testimony of O, Doolan, Kozloski and Wisnie to conclude that the Letter Grade attendance records were the product of an unfortunately timed computer coding error made by the victim's homeroom teachers. Moreover, with respect to the defendant's claim that the victim's testimony was inconsistent, contradictory and substantially uncorroborated by physical evidence,[44] none of the claimed inconsisten-

---

[44] The defendant asserts repeatedly that the victim "testified that she knowingly destroyed any physical evidence that could have exonerated—or implicated—the [defendant]," and that "the lack of physical evidence that would have implicated—or exonerated—[the defendant] is a direct result of the [victim's] actions." He further argues in his reply brief that, by showering repeatedly in the days after the assault, the victim herself "took

cies negates the essential elements of the offenses charged. Further, the victim's testimony was corroborated by her descriptions of the green bin of pornographic movies, and evidence of her changed demeanor in the days following May 1. Finally, there was no deadlock to indicate that the present case was a close one in the jury's eyes. See id., 294 ("multiple reports of jury deadlock indicate that the fact finder itself did not view the state's case against the defendant as particularly strong").

Having reviewed all of the *Williams* factors, we conclude that the state has demonstrated, beyond a reasonable doubt, the reasonable likelihood that the jury's verdict would not have been different absent the impropriety in the present case. Although the impropriety was uninvited, the remarks by the prosecutor during her closing argument, describing the victim as brave and courageous, were neither frequent nor severe. Furthermore, while the impropriety related to a central portion of the state's case, the defendant's failure to seek curative measures at trial further indicates a lack of severity. Moreover, the state's case was relatively strong in that it was not wholly dependent on the uncorroborated testimony of the victim, and there is no indication that the jury felt otherwise. Accordingly, we conclude that the prosecutorial impropriety did not deprive the defendant of a fair trial.

The judgment is affirmed.

In this opinion the other justices concurred.

---

actions that ensured that her allegations could not be substantiated—or disproven—by physical evidence . . . ." Bearing in mind expert testimony that many substantiated sexual assault claims lack physical evidence; see footnote 11 of this opinion; we note that there is no evidence that the victim showered for any reason other than that she felt unclean following a sexual assault; the defendant does not point to any evidence that she engaged in these actions for the purpose of intentionally spoliating important evidence. Indeed, with respect to the victim's actions in both washing and disposing of her clothes from the day of the assault, she specifically testified that she "didn't know if [the clothes] were important or not."