## STATE OF CONNECTICUT *v.* JESUS RUIZ
### (AC 30605)

*Gruendel, Flynn and Dupont, Js.*

Argued May 19—officially released September 28, 2010

*Carlos E. Candal,* special public defender, for the appellant (defendant).

*Melissa L. Streeto,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Brian K. Sibley, Sr.,* senior assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Jesus Ruiz, appeals from the judgment of conviction, rendered after a jury trial, of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of risk of injury to a child in violation of General Statutes § 53-21 (a) (2) and one count of sexual assault in the

fourth degree in violation of General Statutes § 53a-73a (a) (1) (A). On appeal, the defendant claims that (1) the trial court improperly granted the state's motion, made pursuant to General Statutes § 54-86g (a), to allow the victim, N,[1] to testify outside the defendant's presence and to present her testimony to the jury via videotape, and (2) certain remarks made by the prosecutor during closing arguments to the jury were improper and caused substantial prejudice, which denied the defendant a fair trial. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the issues presented in the defendant's appeal. The charges against the defendant arise out of two incidents of inappropriate sexual contact he had with N. In January, 2006, the defendant resided with N, N's mother and N's older brother, S. N's younger sister, C, resided with an aunt. At the time of trial, N was eleven years old. The offenses occurred sometime between 2002 and 2003 when N was five or six years old and in the first or second grade. In January, 2006, when N was nine years old, she met with her school guidance counselor and Amy Gionfriddo, an investigative social worker for the department of children and families (department), regarding an unrelated matter.[2] At that time, N reported to Gionfriddo one instance of sexual abuse by the defendant. N went to live with her aunt and C during the investigation of that abuse. In April, 2006, N revealed to Carla Barrows, a department social worker assigned to the family and who conducted regular visits with N at her aunt's home, a second instance of the defendant's abuse.[3]

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] The unrelated matter involved a nonsexual incident between N and S concerning a knife and did not involve the defendant.

[3] N and C, after spending time in foster care, eventually went to live with a different aunt, who obtained legal custody of N in August, 2007.

Following a jury trial, the defendant was convicted on all four counts and sentenced to a total effective term of seventeen years imprisonment, suspended after twelve years, with ten years probation. This appeal followed. Additional facts will be set forth as necessary.

I

Regarding the defendant's first claim, the issue to be resolved is whether, in a criminal prosecution involving the alleged sexual abuse of a child, the victim may testify through the use of a videotape made outside the presence of the defendant if the court has concluded, after an evidentiary hearing, that the state has demonstrated a compelling need to exclude the defendant from the witness room during the videotaping of the victim's testimony. See *State* v. *Jarzbek*, 204 Conn. 683, 684–85, 529 A.2d 1245 (1987), cert. denied, 484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988).[4] In this case, the court found, after a hearing pursuant to § 54-86g, that the state had shown a compelling need for the videotaping procedure used.[5] The defendant claims that the court abused its discretion by allowing N to testify outside his presence because the state failed

[4] In *State* v. *Jarzbek*, supra, 204 Conn. 704, our Supreme Court held that "in criminal prosecutions involving the alleged sexual abuse of children of tender years, the practice of videotaping the testimony of a minor victim outside the physical presence of the defendant is, in appropriate circumstances, constitutionally permissible." (Internal quotation marks omitted.) *In re Tayler F.*, 296 Conn. 524, 540, 995 A.2d 611 (2010).

[5] This conclusion is a factual determination of the trial court and is not within the purview of this court; see *State* v. *Jarzbek*, supra, 204 Conn. 706; unless there has been an abuse of discretion in the court's ruling; see *State* v. *Bronson*, 258 Conn. 42, 49, 779 A.2d 95 (2001) (trial court abused discretion when it denied request to appoint expert to examine child prior to *Jarzbek* hearing); or a factual finding which is clearly erroneous. See *Auerbach* v. *Auerbach*, 113 Conn. App. 318, 327, 966 A.2d 292 ("[a] factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made" [internal quotation marks omitted]), cert. denied, 292 Conn. 901, 971 A.2d 40 (2009).

to show, by clear and convincing evidence, that her testimony would have been less reliable if she had been required to testify in his presence.[6] He also claims that this mistake deprived him of his constitutional right to confrontation. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. The state filed a motion to videotape N's testimony outside the presence of the defendant pursuant to § 54-86g (a)[7] and *State* v. *Jarzbek*, supra, 204 Conn. 704–705. The court held a

[6] The defendant maintains that our standard of review is whether the court abused its discretion because "an evidentiary ruling is reviewed under an abuse of discretion standard." The videotaped testimony however, is not hearsay; its introduction by the court is not an evidentiary exception to the hearsay rule and it is the functional equivalent of testimony in court. *State* v. *Jarzbek*, supra, 204 Conn. 697. As such, we review the court's findings to determine if they were clearly erroneous. See *State* v. *Alterisi*, 47 Conn. App. 199, 205, 702 A.2d 651 (1997); see also Practice Book § 60-5.

[7] General Statutes § 54-86g (a) provides: "In any criminal prosecution of an offense involving assault, sexual assault or abuse of a child twelve years of age or younger, the court may, upon motion of the attorney for any party, order that the testimony of the child be taken in a room other than the courtroom in the presence and under the supervision of the trial judge hearing the matter and be televised by closed circuit equipment in the courtroom or recorded for later showing before the court. Only the judge, the defendant, the attorneys for the defendant and for the state, persons necessary to operate the equipment and any person who would contribute to the welfare and well-being of the child may be present in the room with the child during his testimony, except that the court may order the defendant excluded from the room or screened from the sight and hearing of the child only if the state proves, by clear and convincing evidence, that the child would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that a compelling need exists to take the testimony of the child outside the physical presence of the defendant in order to insure the reliability of such testimony. If the defendant is excluded from the room or screened from the sight and hearing of the child, the court shall ensure that the defendant is able to observe and hear the testimony of the child, but that the child cannot see or hear the defendant. The defendant shall be able to consult privately with his attorney at all times during the taking of the testimony. The attorneys and the judge may question the child. If the court orders the testimony of a child to be taken under this subsection, the child shall not be required to testify in court at the proceeding for which the testimony was taken."

hearing to determine whether N had the ability to testify reliably in the presence of the defendant. Pamela Goldin, a licensed clinical social worker employed by the Child Guidance Clinic for Central Connecticut, Inc., for more than twenty-seven years, testified that she had been treating N for two years. According to Goldin, N has "weak language skills," "[h]er ability to express herself is below average for her age," she has poor self-esteem, she becomes "overwhelmed with anxiety" and she is "very easily intimidated."

Goldin discussed a specific experience with N. She testified that N was distraught that her mother did not believe the accusations that she had made about the defendant. When Goldin and N prepared for a session at which N's mother also would be present, Goldin testified that N talked at length about all the things she wanted to make sure she told her mother. Goldin testified that N "froze" when the time came for N to speak to her mother. She could not speak and said very little of what she wanted to say, even though she was in a "secure, familiar setting with a number of people there with whom she was comfortable and felt supported." Goldin testified that this behavior occurred at two separate sessions. She testified that during her work with N, she and N discussed the allegations that N had made against the defendant "so that if she wanted to discuss at length what happened with [the defendant] that she could. And she did tell me a little bit, but she was clearly uncomfortable discussing it at great length. And I didn't press her." She stated that testifying in the defendant's presence, in addition to being a "real hardship for [N]" that would "set her back emotionally," would cause N to "freeze." Goldin testified: "I don't think she'd speak—I think she'd just be totally intimidated." "I doubt that she would . . . speak in the way that people are going to need her to speak in order to give the information you'll be asking of her."

Following the hearing, the court found: "[Goldin] observed [the] child for almost two years. How [N] reacts when this incident would come up. How, when she confronted the mother, she became [mute and] left the room. . . . [K]nowing this young girl for two years, [Goldin testified that N] could not testify truthfully and reliably in front of the defendant. [Goldin gave] her reasons why, based upon her anxiety level, she'd be frightened, she'd be intimidated, her lower level of education, her low level of esteem . . . . I find [that] the state has met its burden by clear and convincing evidence pursuant to *Jarzbek*. . . . [Goldin] also said that [N] would be so stressed . . . I just can't take two years of treatment and ignore it. She didn't meet this young girl a week or a month ago." Accordingly, the court granted the state's motion.

Our standard of review is well established. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In evaluating preliminary determinations of the trial court in a criminal case, [t]he evidence will be construed in a way most favorable to sustaining the [determination] . . . .

"[I]n criminal prosecutions involving the alleged sexual abuse of children of tender years, the practice of videotaping the testimony of a minor victim outside the physical presence of the defendant is, in appropriate circumstances, constitutionally permissible. . . . [A]

trial court must balance [in a case-by-case analysis] the individual defendant's right of confrontation against the interest of the state in obtaining *reliable* testimony from the particular minor victim in question. . . . [The] trial court must determine, at an evidentiary hearing, whether the state has demonstrated a compelling need for excluding the defendant from the witness room during the videotaping of a minor victim's testimony. In order to satisfy its burden of proving compelling need, the state must show that the minor victim would be so intimidated, or otherwise inhibited, by the physical presence of the defendant that the trustworthiness of the victim's testimony would be seriously called into question. . . . [T]he state bears the burden of proving such compelling need by clear and convincing evidence. . . . The defendant's right to confrontation is not violated when the state shows, by clear and convincing evidence, that if the victim testified in the defendant's presence, the victim's testimony would be less reliable or accurate. See *State* v. *Jarzbek*, [supra, 204 Conn. 704–705]." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Gombert*, 80 Conn. App. 477, 485–86, 836 A.2d 437 (2003), cert. denied, 267 Conn. 915, 841 A.2d 220 (2004). In summary, "[t]he procedures prescribed by § 54-86g (a) are designed to balance carefully both the defendant's right to confrontation and the state's interest in securing reliable testimony from minor victims of sexual assault. See General Statutes § 54-86g (a). We approved of virtually identical procedures in *State* v. *Jarzbek*, [supra, 683]." *State* v. *Arroyo*, 284 Conn. 597, 620, 935 A.2d 975 (2007).

"The clear and convincing standard of proof is substantially greater than the usual civil standard of a preponderance of the evidence, but less than the highest legal standard of proof beyond a reasonable doubt. It is sustained if the evidence induces in the mind of

the trier a reasonable belief that the facts asserted are *highly probably true*, that the probability that they are true or exist is *substantially greater* than the probability that they are false or do not exist. . . . *State* v. *Bonello*, 210 Conn. 51, 66, 554 A.2d 277, cert. denied, 490 U.S. 1082, 109 S. Ct. [2103, 104] L. Ed. 2d 664 (1989)." (Emphasis in original; internal quotation marks omitted.) *In re Giovanni C.*, 120 Conn. App. 277, 279, 991 A.2d 638 (2010).

The defendant maintains on appeal that the majority of Goldin's testimony, and indeed the majority of Goldin's contact with N during the two years that Goldin treated N, involved N's relationship with her mother, not the defendant, and, therefore, was insufficient to prove by clear and convincing evidence that it was his presence that would intimidate N. On the basis of our review of the record, we conclude that the court reasonably could have concluded that N had weak language skills, poor self-esteem and a high level of anxiety, and that she was very easily intimidated. The court also reasonably could have concluded that it was highly probable that the defendant's presence would cause N to "freeze" such that she would not speak at all. "The victim's complete inability to testify destroys any opportunity for reliable or accurate testimony." *State* v. *Gombert*, supra, 80 Conn. App. 486. Viewing the evidence in the light most favorable to sustaining the court's determination, the court's decision that the state had shown by clear and convincing evidence that there was a compelling need to videotape N's testimony outside the defendant's presence was not clearly erroneous. See id.

The defendant also claims that he was deprived of his constitutional right to confrontation under *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), which held that testimonial hearsay is admissible against a criminal defendant at trial only if

the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. The defendant does not claim that the court failed to follow the procedures identified in § 54-86g or *Jarzbek*. Rather, he claims that his right to confrontation requires N to testify in court so that he may confront his accuser face to face and that our Supreme Court should reconsider *Jarzbek* in light of *Crawford*.

This claim must fail in light of our Supreme Court's ruling in *State* v. *Arroyo*, supra, 284 Conn. 597, in which the court considered the precise constitutional claims raised by the defendant. The *Arroyo* court, like the court in *Jarzbek*, considered the importance of face-to-face confrontation. The court noted that criminal defendants do not have "the *absolute* right to a face-to-face meeting with witnesses against them at trial"; (emphasis in original; internal quotation marks omitted) id., 622; but, rather, "under appropriate circumstances, the state's interest in securing reliable testimony from the particular child victim in question may outweigh a defendant's right of face-to-face confrontation." Id., 623.[8]

In the present case, the court's finding that the state showed, by clear and convincing evidence, that if N

[8] We note that our Supreme Court in *State* v. *Arroyo*, supra, 284 Conn. 622 n.18, squarely rejected the defendant's argument that *Crawford* undermined the constitutional underpinnings of *Maryland* v. *Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990), in which the United States Supreme Court upheld a Maryland statute that permitted a child to testify outside the defendant's presence. "The court in *Craig* expressly declined to hold that the child witness' closed circuit testimony constituted out-of-court statements. . . . Therefore, *Craig*'s reliance on [*Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], among other precedents, for its conclusion that the right to face-to-face confrontation properly may be balanced against competing public interests, does not invalidate its holding that such a balancing is proper." (Citation omitted; internal quotation marks omitted.) *State* v. *Arroyo*, supra, 622–23 n.18.

testified in the defendant's presence, her testimony would be less reliable or accurate was not clearly erroneous. The defendant's right to confrontation is not violated when the state makes that showing. A review of the record reveals that defense counsel had ample opportunity to cross-examine N. We note that the defendant does not claim that the court failed to follow the procedures identified in § 54-86g or *Jarzbek*. We conclude that the defendant's right to confrontation was not violated.

## II

Regarding the defendant's second claim, the issue to be resolved is whether certain remarks made by the prosecutor during his rebuttal to the defendant's closing argument to the jury deprived the defendant of due process and a fair trial. Specifically, the defendant claims that the prosecutor (1) impermissibly expressed his opinion as to N's credibility and (2) improperly appealed to the emotions of the jury.[9] The state concedes that some of the remarks were improper but maintains that they did not deprive the defendant of due process or a fair trial. We agree with the state.

Throughout his closing argument, the defendant attacked the credibility of N, in part by repeatedly stating or implying that N had admitted fabricating an unrelated incident involving her brother and a knife, the

---

[9] "Once prosecutorial impropriety has been alleged . . . it is unnecessary for a defendant to seek to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and it is unnecessary for an appellate court to review the defendant's claim under *Golding*. . . . The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [our Supreme Court] in . . . [*State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)]." (Internal quotation marks omitted.) *State* v. *Jordan*, 117 Conn. App. 160, 163, 978 A.2d 150, cert. denied, 294 Conn. 904, 982 A.2d 648 (2009).

reason for which N initially met with Gionfriddo.[10] The defendant argued that the timing of the disclosures was suspect. Specifically, he argued that the second disclosure was designed to allow N to remain with her aunt. In his rebuttal, the prosecutor made a number of statements in which he implied that N was credible because professionals who testified believed she was credible. Specifically, he stated that N would have had to have been a genius to be able to "get by" the professionals in the department and others. The prosecutor also made two statements that the defendant characterizes as improperly appealing to the emotions of the jury.

"We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a

---

[10] The statements in which the defendant's counsel stated or implied that N had admitted fabricating an unrelated incident include: "[C]ould this child be telling the truth on this date even though she didn't tell the truth about a lot of things on that date? . . .

"This kid with a history of telling stories . . . . [D]o you know what was going on in her head when she said some of the things that she said that now everyone agrees simply are not true? Her counselor up to the other day was still holding onto the knife story. . . .

"[S]he didn't want to go to school and face the consequences of her story until . . . last week or so when she admitted it clearly, that it was just a story."

whole. . . . We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his [or her] office, [the prosecutor] usually exercises great influence upon jurors. [The prosecutor's] conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he [or she] represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice or resentment. If the accused be guilty, he [or she] should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32–33, 917 A.2d 978 (2007).

A

The Claims of Prosecutorial Impropriety

The first step in our analysis is to determine whether prosecutorial impropriety occurred. We first address the defendant's claim that the state impermissibly expressed its opinion as to N's credibility. "It is well settled that [a] prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . It is not, however, improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . ."

(Internal quotation marks omitted.) *State* v. *Tomas D.*, 296 Conn. 476, 512, 995 A.2d 583 (2010).

The state concedes that through a number of statements made during its rebuttal argument to the jury, the prosecutor improperly "implied that the jury should believe [N] because other professionals who had testified had believed her."[11] Given the state's concession,

---

[11] The following excerpts are from the state's rebuttal argument. The defendant challenges those statements that are italicized. In his rebuttal, the prosecutor read to the jury an exchange that occurred between the defendant's counsel and N during counsel's cross-examination of N during her videotaped testimony.

"[Defense Counsel]: But that isn't the reason you didn't want to go to school, you didn't want to go to school because you didn't want to get your brother in trouble on a made-up story about a knife?

"[N]: Yeah.

"[The Prosecutor]: Well, which part of that question was she answering yeah to? Did she hear the whole thing? Yeah. The trained person on the [witness] stand yesterday, the person was trained in communications, trained to listen to people, and it was a question that was asked of her where even she admitted she missed part of it and answered to it a different part. You got a kid we're talking about. *And in order to believe that she is coming up with the story, concocting the story, she has to be an intellectual genius to be able to get by the people who are trained in this field, to get by somebody who has interviewed thousands of children, hundreds of children by Ms. [Theresa] Montelli* [a forensic interviewer employed by Yale-New Haven Hospital in its child sexual abuse clinic] . . . .

*"Does she have the intellect to be able to come up with this story? . . . You have to believe it's a giant conspiracy if you want to believe that each of these caretakers, each of these workers has found a job that they are trained to do, falls for a story from a young girl. Well, if that's the case, they should be in a different line of work. If a young girl can buffalo them to that point, they should be in a different line of work. . . .*

"The idea is to get you to believe that the story she told to the counselor about the knife incident, well, that's a lie, but there [were] a whole bunch of other lies before that. Where were they? We didn't hear any of that. . . . [You need to] use your own intuition, your own intellect in making your decision as to whether the story makes sense. *Because in order for [N] to make up the story and this plot from nine years old up until now, she has to know the ways and means of [department] protocols to get by them so she could get herself into new places. . . .*

"So, what information do you have? You have to take what you believe, you have to take your intuition, your common sense, apply it as you listen to her tell her account of what happened to her, and then apply the law

we must consider the impact of these statements on the fairness of the defendant's trial. See part II B of this opinion.

We next address the defendant's claim that the state improperly appealed to the emotions of the jury. "[A] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) *State* v. *Bell*, 283 Conn. 748, 773, 931 A.2d 198 (2007). The defendant refers to two statements the state made during its rebuttal to his closing argument that he claims improperly appealed to the emotions of the jury.

The first statement the defendant claims improperly appealed to the emotions of the jury was: "Talk about messages, the messages aren't to be sent anywhere other than this message: we have children, we teach them ways to do stuff, and that's to protect themselves. We teach them the way to do that. Did [N] do that in this case? Yes, she did." The defendant maintains that this remark improperly "urged the jurors . . . to decide the case on their sympathy for the victim . . . rather than the evidence . . . . [I]t suggested that a

---

because *otherwise you would have to believe that these people that we entrust to do these investigations, the people we entrust our children to be safe with and look out for the children, they have no idea what they're doing. We might as well close* [*the department*] *down because they have a pointed view and that's to go out and get people like* [*the defendant*]. *Or is their training and experience from that they are told in regard to the research, the training that they continue to go to, is it more right than wrong?*" (Emphasis added.)

message should be sent, and that message is that 'we have children' and they should be protected, and the only way to do that is by convicting the defendant." Whether N had received the proper messages from her teachings in order to protect herself is difficult to convert or to equate to a statement that the defendant must be convicted because N properly had protected herself. We conclude that the defendant's contention is not a reasonable reading of the prosecutor's remark in the context in which it was made. We conclude that the first statement was not improper.

The second statement that the defendant claims appealed to the emotions of the jury was: "You don't want to believe that good people do bad things. Look at the priests. When you first hear that, [it is] so commonplace now; you hear it, and it almost becomes a joke—unless you're one of the people that he was touching, it is no longer a joke anymore." The state concedes, and we agree, that this second statement was improper. Accordingly, we must also consider the impact of this statement on the fairness of the defendant's trial.

B

Impact on the Fairness of the Defendant's Trial

We now apply the well established six factor analysis from *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), to determine whether the state has established beyond a reasonable doubt that the prosecutorial improprieties did not deprive the defendant of a fair trial. "Under the well established analysis of *State* v. *Williams*, [supra, 540], we consider: (1) the extent to which the [impropriety] was invited by defense conduct or argument; (2) the severity of the [impropriety]; (3) the frequency of the [impropriety]; (4) the centrality of the [impropriety] to the critical issues in the case; (5) the strength of the curative measures adopted; and (6) the strength of the state's case." (Internal quotation

marks omitted.) *State* v. *Tomas D.*, supra, 296 Conn. 513–14 n.43. "This analysis requires us to view the prosecutor's comments in the context of the entire trial and determine whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) Id., 514.

We will first examine the statements in which the prosecutor improperly implied that N was credible. With respect to the first *Williams* factor, the state maintains that the statements regarding the defendant's credibility were invited by defense counsel. The state properly challenged defense counsel's characterization of N's testimony regarding the incident involving her brother and a knife. See footnote 11 of this opinion. It was in that context that the state made the comments regarding N needing to be an "intellectual genius" to have concocted her story and fooled a number of trained professionals. We conclude that the remarks that implied that N was credible because other professionals who testified believed her, though improper, were invited by defense counsel's closing argument. See footnote 10 of this opinion.

With respect to the second factor, namely, the severity of the impropriety, "it is well settled that a defendant's failure to object or to seek curative measures at trial supports the state's contention that the impropriety was not severe. . . . Defense counsel's failure to object at trial is, however, not by itself fatal to a defendant's claim . . . . Thus, the apparent lack of severity with respect to the impropriety is counterbalanced in part by the third *Williams* factor, namely, the frequency of the [impropriety] . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Tomas D.*, supra, 296 Conn. 514. The defendant maintains that there were "at least ten" improper statements. See footnote 11 of this opinion. If we accept that count as accurate, the

improper remarks were frequent during the rebuttal argument, which consisted of approximately nine pages of transcripts. Cf. *State* v. *Jordan*, 117 Conn. App. 160, 169, 978 A.2d 150 (fourteen instances over course of eighteen pages of transcripts were frequent), cert. denied, 294 Conn. 904, 982 A.2d 648 (2009). We note, however, that the improper remarks were isolated to a discrete part of the trial, the prosecutor's rebuttal argument. Cf. *State* v. *Warholic*, 278 Conn. 354, 398, 897 A.2d 569 (2006) ("the instances of prosecutorial [impropriety] were not isolated because they occurred during both the cross-examination of the defendant and the prosecutor's closing and rebuttal arguments").

With respect to the fourth *Williams* factor, the centrality of the impropriety to the critical issues in the case, it supports the defendant's claim, "as comments implying that the victim testified truthfully or otherwise supporting her credibility are particularly significant, as without independent physical evidence to prove that the defendant had sexually assaulted [the victim], or even that [the victim] had been sexually assaulted at all, the significance of the [prosecutor's] improper conduct increases considerably." (Citation omitted; internal quotation marks omitted.) *State* v. *Tomas D.*, supra, 296 Conn. 515.

With respect to the fifth *Williams* factor, namely, the strength of the curative measures adopted, the state concedes that the court did not employ any corrective measures directed specifically at the improper remarks. The state refers to the court's general instruction to the jury in which the court instructed that counsel's arguments were not evidence and that only the jury's assessment of credibility mattered. "Although a general instruction does not have the same curative effect as a charge directed at a specific impropriety . . . when a defendant . . . fails to object at trial, he bears much of the responsibility for the fact that these claimed

improprieties went uncured, especially because defense counsel's failure to object to the prosecutor's argument[s] . . . when [they were] made suggests that defense counsel did not believe that [they were] unfair in light of the record of the case at the time." (Citation omitted; internal quotation marks omitted.) Id., 515–16.

Finally, we consider the sixth *Williams* factor, namely, the strength of the state's case. The defendant argues that N's testimony was neither corroborated by physical evidence nor by independent eyewitnesses and was therefore weak. The state argues that none of N's allegations were contradicted by evidence presented at trial and that testimony from her counselor, from the department workers and from a forensic interviewer employed by Yale-New Haven Hospital in its child sexual abuse clinic demonstrate that N's allegations were consistent. Our Supreme Court has stated that "a child sexual abuse case lacking conclusive physical evidence, when the prosecution's case rests on the credibility of the victim . . . is not particularly strong . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 397. It, however, has never stated that "the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial [impropriety] did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Tomas D.*, supra, 296 Conn. 516.

Having reviewed the *Williams* factors, we conclude that although the challenged remarks were central to the issue of N's credibility, they were cured by the court's general instructions. Moreover, the remarks were invited by defense counsel's closing argument and confined to the prosecutor's rebuttal argument, and the defendant's failure to seek further curative measures at trial indicates that they lacked severity. Accordingly, we conclude that this prosecutorial impropriety did not deprive the defendant of a fair trial.

We next apply the *Williams* factors to the comment that the prosecutor made regarding priests, which improperly appealed to the emotions of the jury. As to the first factor, the state concedes that the defendant did not invite this impropriety. As to the second factor, the comment was not severe because it did not pertain to the critical issues in this case nor did the defendant object to it at the time of trial. The comment was a single passing comment confined to the state's rebuttal argument and was therefore infrequent under the third *Williams* factor. As to the fourth factor, the comment was not central to the critical issues in the case because it did not pertain to the issue of N's credibility or to whether the defendant was guilty as charged. As to the fifth factor, the state concedes that no curative measures were adopted, but, because the defendant did not object to this comment at trial, he bears much of the responsibility for the fact that this claimed impropriety went uncured. See id., 515–16. As to the sixth factor, we conclude, after an examination of the entire record, that the strength of the state's case was sufficient for a finding of guilty beyond a reasonable doubt, despite the improper remark. See id., 516–17.

Having reviewed all of the *Williams* factors with respect to both the improper remarks that implied that N was credible and the comment regarding priests, which improperly appealed to the emotions of the jury, we conclude that the state has demonstrated, beyond a reasonable doubt, the reasonable likelihood that the jury's verdict would not have been different absent the prosecutorial improprieties.

The judgment is affirmed.

In this opinion the other judges concurred.